**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 29 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENNTH CIRCUIT

NANCY GAYLOR,

      Plaintiff - Appellant,

vs.

JOHN HANCOCK MUTUAL LIFE
INSURANCE COMPANY, a corporation,

      Defendant - Appellee.

No. 96-6038

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-93-1981-M)

Glenn Mullins, Oklahoma City, Oklahoma, for Plaintiff-Appellant.

L.E. Stringer and Mark D. Spencer, Crowe & Dunlevy, Oklahoma City, Oklahoma, for
Defendant-Appellee.

Before KELLY, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and BRISCOE,
Circuit Judge.[*]

KELLY, Circuit Judge.

---

   [*] After examining the briefs and the appellate record, this three-judge panel has
determined unanimously that oral argument would not be of material assistance in the
determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The cause is
therefore ordered submitted without oral argument.

Plaintiff Nancy Gaylor appeals from a district court decision affirming the denial of her claim for long-term disability benefits. Ms. Gaylor maintains first that her policy with Defendant John Hancock Mutual Life Insurance Company (Hancock) is not governed by the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. No. 93-406, 88 Stat. 832 (codified as amended at 29 U.S.C. §§ 1001-1461). Second, she argues that even if her claim is governed by ERISA, the bases relied upon by Hancock were insufficient to deny her claim. Our jurisdiction arises under 28 U.S.C. § 1291, and we reverse.

Facts

As part of an association of employers, the Morris General Agency (Morris) purchased two group insurance policies from Hancock, for the purpose of providing insurance benefits to its employees. Employees of Morris become eligible to receive benefits after six months of employment with Morris. Should employees choose to participate, life and accidental death and dismemberment (ADD) policies are mandatory; other coverage, including disability, is optional. Morris contributes the entire cost of the premiums for its employees' life and ADD insurance; for certain employees, Morris also contributes part of the premiums for its employees' disability insurance.

Morris hired Nancy Gaylor as a salaried employee on March 1, 1992. On June 13,

1992, Ms. Gaylor slipped on wet concrete and fell, injuring her lower back. Two days later, she saw a doctor, who prescribed pain medication and diagnosed her with "sciatic neuritis." She continued to visit general practitioners over the summer, and was finally referred to Dr. J. Patrick Livingston, who set up a magnetic resonance imaging (MRI) test and an electromyography (EMG) study. On the basis of the MRI and EMG, Dr. Livingston concluded that Ms. Gaylor was not in need of orthopedic surgery, and recommended that Ms. Gaylor see a neurosurgeon. She did so in late November 1992, and the neurologist again could find no cause for Ms. Gaylor's condition. In a letter dated November 23, 1992, Dr. Livingston indicated that Ms. Gaylor was still his patient and that he would see her in further follow-ups.

In the meantime, Ms. Gaylor's condition had hindered her work with Morris, and her work production suffered. She filed a disability claim form on October 13, 1992, claiming that although her accident occurred in June, she was unable to work as of October 13, 1992. Two days later, Morris terminated Ms. Gaylor's employment.

In January 1993, Hancock requested an independent medical examination of Ms. Gaylor's injury by Dr. Ronald R. Chadwell, who also could not verify the cause of Ms. Gaylor's disability through clinical or laboratory means. He did agree with Dr. Livingston and Ms. Gaylor's primary care physicians, however, that Ms. Gaylor suffered from a debilitating condition, and diagnosed a back strain secondary to her fall and also some early degenerative changes in the lumbo-sacral spine area.

On March 1, 1993, Hancock authorized payment of $1,345.73 on Ms. Gaylor's claim for the two-week period from November 14, 1992 to November 28, 1992. On March 2, 1993, Ms. Gaylor saw Dr. Livingston, who informed her that there was nothing more he could do for her and suggested that she return to her primary care physicians for long-term treatment. Dr. Livingston later explained in a letter to Hancock that he believed that Ms. Gaylor's chronic, non-surgical condition required follow-up and care and medications that are best handled by primary care physicians who would continue to see patients on a regular basis. Ms. Gaylor followed Dr. Livingston's advice, and, in June, attempted to make an appointment with a general practitioner. She was rejected, however, because she was financially unable to pay the doctor's bill. On August 10, 1993, Ms. Gaylor finally did see her primary care physician.

Finally, on October 4, 1993, Hancock denied Ms. Gaylor's claim for any additional benefits under her disability policy, claiming that (1) she was not under the regular care of a physician, and (2) her physical condition could not be verified by the use of clinical and laboratory diagnostic means. On November 9, 1993, Ms. Gaylor filed this lawsuit.

Discussion

## I. ERISA Preemption

Ms. Gaylor argues that her policy with John Hancock is not part of an "employee welfare benefit plan" within the meaning of ERISA, 29 U.S.C. § 1002(3). She further argues that even if her policy is part of an ERISA plan, her claims under Oklahoma state law fall within the ERISA savings clause, 29 U.S.C. § 1144(b)(2)(a), and thus are not exempted by ERISA.

### A. Whether Morris established or maintained an "employee welfare benefit plan"

We must first determine whether ERISA covers the insurance benefits which Morris provides to its employees, a question which we review de novo. Peckham v. Gem State Mut. of Utah, 964 F.2d 1043, 1047 (10th Cir. 1992).

Ms. Gaylor argues that the benefits provided by Morris are excluded from ERISA coverage under the "safe harbor" provision, 29 C.F.R. § 2510.3-1(j), which provides that the term "employee welfare benefit plan" shall not include programs in which (1) no contribution is made by the employer; (2) participation in the program is completely voluntary for the employees; (3) the sole functions of the employer are to permit the insurer to publicize the program to employees and to collect premiums through payroll deductions; and (4) the employer receives no consideration in connection with the program. Plans which meet each of these four factors are excluded from ERISA coverage. Hansen v. Continental Ins. Co., 940 F.2d 971, 977 (5th Cir. 1991). The district

court indicated that if the safe harbor provision does not apply, "the employer's involvement in the insurance program is deemed sufficiently significant to qualify the program as an 'employee welfare benefit plan' subject to ERISA." Aplt. App. at 389. We observed in Peckham, however, that "[t]he fact that [a] plan is not excluded from ERISA coverage by this regulation does not compel the conclusion that the plan is an ERISA plan." 964 F.2d at 1049 n.10. "[A] program that fails to satisfy the [safe harbor provision] is not automatically deemed to have been 'established or maintained' by the employer, but, rather, is subject to further evaluation under the conventional tests." Johnson v. Watts Regulator Co., 63 F.3d 1129, 1133 (1st Cir. 1995).

Ms. Gaylor argues that no contribution was made by Morris with respect to her disability insurance, and that the first factor is therefore satisfied. Morris did contribute, however, the entire cost of Ms. Gaylor's ADD insurance, which was mandatory once Ms. Gaylor chose to enroll for coverage. For purposes of satisfying the safe harbor provision, Ms. Gaylor attempts to sever her optional disability coverage from the rest of the benefits she received through her employer's plan. "This cannot be done because the [optional] coverage was a feature of the Plan, notwithstanding the fact that the cost of such coverage had to be contributed by the employee." Smith v. Jefferson Pilot Life Ins. Co., 14 F.3d 562, 567 (11th Cir.), cert. denied, 513 U.S. 808 (1994); see also Glass v. United of Omaha Life Ins. Co., 33 F.3d 1341, 1345 (11th Cir. 1994).

Having determined that the safe harbor provision does not apply, we now turn to the "conventional tests" for whether Morris's plan is governed by ERISA. Johnson, 63 F.3d at 1133. ERISA governs "employee benefit plans," 29 U.S.C. § 1003(a), one form of which is an "employee welfare benefit plan," 29 U.S.C. § 1002(3). ERISA defines "employee welfare benefit plan" as:

> any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . .

29 U.S.C. § 1002(1).

The definition can be broken down into five elements: (1) a "plan, fund, or program" (2) established or maintained (3) by an employer (4) for the purpose of providing health care or disability benefits (5) to participants or their beneficiaries. See Peckham, 964 F.2d at 1047. It is clear that Ms. Gaylor, as an employee of Morris, was provided with life, ADD and disability benefits. We must now determine whether Morris established or maintained a plan within the meaning of § 1002(1).

A "plan, fund, or program" exists if "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and the procedures for receiving benefits." Id. ( quoting Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982)). Under this test, we are certain that a plan exists. The intended benefits are life, ADD, medical, accident and sickness, and

disability benefits; the class of beneficiaries is Morris's employees, and if the employees so choose, their dependents; financing comes from both Morris and its employees; and the procedures for receiving benefits are detailed in the informational booklets provided to Morris employees.

Just because a plan exists, however, does not mean that it is an ERISA plan. Hansen, 940 F.2d at 977. We must determine whether Morris established or maintains the plan. As John Hancock points out in its brief, the "established or maintained" requirement is designed to ensure that the plan is part of an employment relationship. Peckham, 964 F.2d at 1049. According to John Hancock, therefore, simply because Ms. Gaylor obtained her disability policy through her employment relationship with Morris, the plan meets the "established or maintained" requirement. This argument fails to recognize, however, that we determine whether the plan is part of an employment relationship "by looking at the degree of participation by the employer in the establishment or maintenance of the plan." Id. An employer's mere purchase of insurance for its employees does not, without more, constitute an ERISA plan. Hansen, 940 F.2d at 978. An important factor in determining whether a plan has been established is whether the employer's purchase of the policy is an expressed intention by the employer to provide benefits on a regular and long-term basis. Peckham, 964 F.2d at 1049; Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1083 (1st Cir.), cert. denied, 498 U.S. 1013 (1990). Thus, although the purchase of insurance does not

conclusively establish a plan, it is evidence of the employer's intention to establish a plan: "the purchase of a group policy or multiple policies covering a class of employees offers substantial evidence that a plan . . . has been established." Donovan, 688 F.2d at 1373 (footnote omitted), quoted in Peckham, 964 F.2d at 1048 n.8. The court in Donovan also cautioned, however, that the mere decision to extend benefits to employees does not "establish" a plan within the meaning of ERISA; instead, it is the "reality of a plan . . . that is determinative." 688 F.2d at 1373.

In this case, there is evidence of Morris's intention to provide benefits on a long-term basis, and also of the reality of an ERISA plan. Morris's purchase of disability insurance from John Hancock was not "an isolated and aberrational incident," Wickman, 908 F.2d at 1083, but was part of a comprehensive insurance program providing to Morris employees several different kinds of insurance. In addition, Morris distributed to its employees a handbook detailing ERISA rights, which is "strong evidence that the employer has adopted an ERISA regulated plan." Id. at 1083. The fact that an employer delegates part of the operational responsibility for the plan to the insurer does not mean that it did not "establish or maintain" a plan. See 29 U.S.C. § 1105(c)(1) (allowing the delegation of fiduciary responsibilities under an ERISA plan). Given Morris's intention to provide its employees benefits on a long-term basis, and the reality of an ongoing comprehensive insurance program, we hold that Morris's plan was clearly part of its

employment relationship with its employees. Thus, Morris's plan meets the "established or maintained" requirement. See Peckham, 964 F.2d at 1049.

Ms. Gaylor cites Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987), for the proposition that Morris's plan must include an "ongoing administrative program" in order to fit within ERISA. Id. at 11. We agree with that proposition, but disagree that Morris's plan is not an ongoing administrative program. As we have noted in the past, Fort Halifax involved a state statute which required employers to provide a single lump-sum payment to employees relating to certain plant closings. Peckham, 964 F.2d at 1048. Because the statute at issue in Fort Halifax required only a single payment, and thus presented no danger of conflict with ERISA regulations, the Court held that the statute was not preempted. In contrast to Fort Halifax, the programs in Peckham and in Ms. Gaylor's case do not involve single lump-sum payments that present no danger of conflicting regulations; instead, these programs are ongoing, and therefore present the danger of conflicting regulations. Peckham, 964 F.2d at 1048; see also Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 45-46 (1987) (describing Congress's intent to preempt the field of employee benefit plans for federal regulations, thus eliminating the threat of conflicting or inconsistent state and local regulation).

B. Whether Ms. Gaylor's state law claim is preempted

Ms. Gaylor claims that Hancock handled her disability claim in bad faith, in violation of Okla. Stat. Ann. tit. 36, §§ 3629, 4405 (West 1990), which provides a cause of action in the event that an insurance claim is improperly processed. Ms. Gaylor argues that even if the plan is governed by ERISA, her state law claim for bad faith is not preemtped because it is exempted by ERISA's "saving clause," which states:

> [N]othing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

29 U.S.C. § 1144(b)(2)(A). This clause is an exception to the general rule, however, and must be harmonized with the "clearly expansive nature" of ERISA's preemption clause. California Div. of Labor Standards Enforcement v. Dillingham Constr., 117 S. Ct. 832, 837 (1997) (detailing Supreme Court cases which have noted the "broad sweep" of ERISA's preemption provision). The preemption clause of ERISA states:

> [T]he provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . . .

29 U.S.C. § 1144(a). Ms. Gaylor concedes that the Oklahoma case law and statutory law "relate to" an employee benefit plan. See Shaw v. Delta Air Lines, 463 U.S. 85, 96-97 (1983) ("A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan.").

- 11 -

The question, then, is whether Oklahoma's bad faith law "regulates insurance" within the meaning of the saving clause. To determine whether a state law regulates the business of insurance, we apply the test adopted by the Supreme Court in Pilot Life, which asks whether the state law (1) has the effect of transferring or spreading a policyholder's risk; (2) is an integral part of the policy relationship between the insurer and the insured; and (3) is limited to entities within the insurance industry. 481 U.S. at 48-49. Ms. Gaylor argues that the Supreme Court "erred" in Pilot Life by adopting this test, and instead should have focused on the relationship between the insurance company and the policyholder. In our view, however, the relationship between insurers and insureds is precisely the focus of the Pilot Life test. More importantly, the Supreme Court's adoption of the test settles the issue; we are bound to apply it and have consistently done so. See, e.g., Fuller v. Norton, 86 F.3d 1016, 1024-25 (10th Cir. 1996) (applying Pilot Life test in ERISA context); Winchester v. Prudential Life Ins. Co. of Am., 975 F.2d 1479, 1484-85 (10th Cir. 1992) (same); Kelso v. General Am. Life Ins. Co., 967 F.2d 388, 391 (10th Cir. 1992) (same).

Our application of the three-part test in Pilot Life, as well as previous cases applying the test to similar state laws, indicates that Oklahoma's bad faith law does not sufficiently regulate insurance such that it falls within ERISA's saving clause. Oklahoma's bad faith law does not regulate the spreading of policyholder risk. Pilot Life, 481 U.S. at 50 (holding that Mississippi bad faith law does not effect a spreading or

- 12 -

transferring of risk); <u>Kelley v. Sears, Roebuck & Co.</u>, 882 F.2d 453, 456 (10th Cir. 1989) (holding that Colorado bad faith law, which was specifically directed at the insurance industry, does not spread policyholder risk). A law which defines the manner in which insurance claims should be processed "declares only that, whatever terms have been agreed upon in the insurance contract, a breach of that contract may in certain circumstances allow the policyholder to obtain [consequential and] punitive damages." <u>Pilot Life</u>, 481 U.S. at 51. Such a law thus does not effect a change in the risk borne by insurers and the insured, because it does not affect the substantive terms of the insurance contract. On the other hand, a law mandating that a certain disease be covered under health insurance contracts would effect a spread of risk, both from insureds to insurers, and among the insureds themselves. <u>Metropolitan Life Ins. Co. v. Massachusetts</u>, 471 U.S. 724, 743 (1985) (holding that a statute requiring insurers to provide mental-health benefits does effect a spreading of risk among policyholders). For substantially the same reasons, we hold that Oklahoma's bad faith law also does not satisfy the second prong of <u>Pilot Life</u>. <u>See Pilot Life</u>, 481 U.S. at 51. Finally, although Oklahoma's bad faith law is specifically directed at the insurance industry, we note that, like the bad faith law in <u>Pilot Life</u>, its origins are from general principles of tort and contract law. <u>See Christian v. American Home Assurance Co.</u>, 577 P.2d 899, 904 (Okla. 1977) (describing the implied covenant of good faith and fair dealing in every contract, and concluding that bad faith

subjects insurer to liability in tort) (quoting Gruenberg v. Aetna Ins. Co., 510 P.2d 1032 (Cal. 1973)).

Finally, we note that in holding that Mississippi's bad faith law was not saved, the Pilot Life court concluded that the civil enforcement provisions of ERISA § 1132(a) were intended to be the "exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits." 481 U.S. at 52. As Ms. Gaylor notes in her own brief, Oklahoma's bad faith law is designed to provide causes of action for the improper processing of a claim for benefits. Aplt. Br. at 28 (citing Okla. Stat. Ann. tit. 36, §§ 3629, 4405 (West 1990)). Thus, Ms. Gaylor's claim under Oklahoma's bad faith law is a claim within the scope of ERISA § 1132(a) and "would pose an obstacle to the purposes and objectives of Congress." Pilot Life, 481 U.S. at 52.

## II.  Hancock's Denial of Disability Benefits

Section 1132(a)(1)(B) of ERISA provides that participants in an ERISA plan may challenge a denial of benefits in district court. The Supreme Court has held that any such challenge under § 1132 "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). John Hancock concedes that the Morris plan gave the

administrator no discretionary authority, and we therefore review Ms. Gaylor's challenge de novo.

John Hancock argues that Ms. Gaylor is not entitled to disability benefits under the plan because (1) she was not shown to be "under a doctor's care," and (2) her physical condition could not be "verified by the use of clinical and laboratory diagnostic techniques." We discuss each of these reasons in turn. First, however, we note that this circuit has held that exhaustion of administrative remedies is an implicit prerequisite to seeking judicial relief under § 1132(a)(1)(B). Held v. Manufacturers Hanover Leasing Corp., 912 F.2d 1197, 1206 (10th Cir. 1990). In its brief, Hancock discusses exhaustion generally but does not argue that Ms. Gaylor's claim should be barred for failure to exhaust her remedies. Because exhaustion in the ERISA context is an implicit prerequisite rather than a statutory one, see id., and has not been asserted by Hancock, there is no need for us to discuss it further and we decline to address the issue.

A. "Under a doctor's care"

Hancock argues that Ms. Gaylor was no longer "under a doctor's care" after November 1992, because she did not see another doctor until March 1993, just over three months later. Hancock's view is much too rigid. Hancock's own guidelines state that the requirement is "necessarily flexible depending on the diagnosis and its level of acuteness or chronicity," and that the "general rule of thumb is to require evidence [of treatment] at

least once every 3 months for acute conditions, [and] 6 months for long-term chronic conditions . . . ." Aplt. App. at 673. At least two doctors characterized Ms. Gaylor's condition as chronic, a characterization that is unchallenged in the record. According to Hancock's own guidelines, then, Ms. Gaylor had until at least late May 1993, to see a doctor. She saw Dr. Livingston in March 1993, well within the six months allotted her by Hancock's guidelines. From March, she had another six months, until September, to satisfy this requirement. She did so in June 1993, when she attempted to see her family physician, but was unable to obtain an appointment because she had no means of paying the bill. It would indeed be anomalous, as well as unjust, to deny benefits because the insurer refused to underwrite the visit, without which the insured cannot afford to see a doctor—the very reason for obtaining insurance in the first place. We also note that Ms. Gaylor finally managed to see her physician on August 10, 1993.

### B. Whether Ms. Gaylor is disabled under the plan

Hancock also denied Ms. Gaylor's claim because her physical condition could not be "verified by the use of clinical and laboratory diagnostic techniques." In light of the substantial evidence confirming Ms. Gaylor's disability, this reason for denying benefits reminds us of the doctor who, when asked for the diagnosis, responds, "we won't know for sure until the autopsy." We hold that Ms. Gaylor presented enough evidence to establish her disability.

The record reflects that Ms. Gaylor suffers from a debilitating condition which prevents her from engaging in any work similar to her job with Morris. Dr. Chadwell, who independently examined Ms. Gaylor at Hancock's request, stated that Ms. Gaylor "is certainly restricted from any stooping, bending, lifting, and prolonged static sitting." Aplt. App. at 553. Dr. Livingston, Ms. Gaylor's orthopedic surgeon, indicated that although Ms. Gaylor is not a candidate for surgery, she still suffers from a "debilitating and painful condition" which prevented her from continuing her job with Morris. Aplt. App. at 556. Although no particular etiology was identified through clinical and laboratory diagnostic means, both physicians agree that Ms. Gaylor suffers from a disabling condition.

These doctors did not use a crystal ball to conclude that Ms. Gaylor was disabled; their opinions were based on clinical physical examinations. The verification requirement must be treated as evidentiary in nature. Medicine is, at best, an inexact science, and we should not disregard the great weight of the evidence merely because objective laboratory diagnostic findings either are not yet within the state of the art, or are inconclusive. Cf. Stone v. First Wyoming Bank, N.A., 625 F.2d 332, 342 n.15 (10th Cir. 1980) ("[T]estimony as to a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached . . . must be taken as true."); Rawdon v. Stanley, 455 F.2d 482, 484 (10th Cir. 1972) ("Unimpeached credible evidence may not be disregarded by the trier of fact.").

Hancock asserted in its brief that it denied Ms. Gaylor's claim on only two grounds, and we have found them both to be inadequate. We therefore reverse Hancock's denial and hold that Ms. Gaylor is entitled to long-term disability benefits.

REVERSED.