Arthur HALPRIN, M.D., Plaintiff,

v.

The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, a New York corporation, Defendant.

No. CIV. 01–B–1321 (CBS).

United States District Court, D. Colorado.

June 17, 2003.

Joanne M. Zboyan, Springer & Steinberg, P.C., Denver, CO, for Plaintiff.

David Warren Feeder, II, Dorsey & Whitney, LLP, Denver, CO, Todd W. Miller, Eric L. Hilty, Thorvald A. Nelson, Holland & Hart, LLP, Greenwood Village, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Plaintiff Arthur Halprin brings claims for: 1) breach of contract; 2) willful and wanton breach of contract; 3) bad faith breach of insurance contract; 4) violation of the Colorado Consumer Protection Act ("CCPA"); and 5) negligence against Defendant The Equitable Life Assurance Society of the United States ("Equitable"). Equitable moves for judgment on the pleadings with respect to plaintiff's second and fifth claims, for summary judgment with respect to all of plaintiff's claims pursuant to Fed.R.Civ.P. 56(b), and for partial summary judgment dismissing plaintiff's bad faith and CCPA claims. Dr. Halprin moves for partial summary judgment regarding entitlement to contract benefits. The motions are adequately briefed and argued. For the reasons set forth below, I GRANT Equitable's motion for judgment on the pleadings, GRANT Equitable's motion for summary judgment pursuant to Fed.R.Civ.P. 56(b), DENY AS MOOT Equitable's motion for partial summary judgment dismissing plaintiff's bad faith and CCPA claims, and DENY Dr. Halprin's motion for partial summary judgment regarding entitlement to contract benefits.

### I. Facts

The following facts are undisputed unless otherwise noted. Doctor Arthur Halprin ("Dr. Halprin") was privately employed as a gastroenterologist by the Southern Colorado Clinic, P.C. ("SCC") in Pueblo, Colorado from 1979 until his 1999 termination. Dr. Halprin's practice included performance of surgery such as colonoscopies, liver biopsies, and gastroscopies.

SCC provided a comprehensive package of insurance to its physicians that included health, life and group disability insurance. SCC's Finance Committee and its Board of Directors addressed issues concerning that insurance, which was provided by Standard Insurance Company ("Standard Plan"). The Standard Plan was mandatory for physicians, and was paid from a shareholder income distribution pool.

Certain physicians carried additional individual disability insurance policies. One such policy—that of Dr. Halprin—is the subject of dispute here. Dr. Halprin's additional disability policy, like that of several of his colleagues, is administered by Equitable.

Some time in the early 1980's, Robert Redwine—an Equitable insurance agent—

met with SCC's Clinic Administrator regarding such individual policies. Mr. Redwine and the Administrator agreed on a plan that would be offered to all doctors at the SCC. Mr. Redwine eventually participated in a meeting with the SCC Board of Directors at which he discussed the proposed policy. The Board then selected Mr. Redwine's offered plan, and a group of policies were subsequently issued to all SCC doctors, including Dr. Halprin.

In the following three to four years, SCC replaced the first Equitable plan with a competing policy from Lincoln National. Then, in 1989, Mr. Redwine again worked with the Clinic Administrator and designed another replacement group of policies from Equitable (the "Equitable Policy" or "Equitable Plan"). Thereafter, Equitable issued replacement policies to SCC physicians. The Equitable Plan consisted of nineteen individual policies issued together to nineteen SCC doctors. Dr. Halprin and the other physicians received a ten to twenty percent "group discount" on the premiums for the Equitable Policy.

Though SCC's involvement was limited, SCC issued checks for the doctors' premium payments. The payments were deducted from each shareholder's income distribution pool and debited from what would otherwise have been paid to them. The physicians' premiums are after-tax payments and are included on the physicians' W–2 forms. No evidence suggests that SCC held out the opportunity to acquire the Equitable Policy as part of its compensation package, and SCC was not involved in the addition of newly hired doctors to the Equitable Plan.

Some time in 1997, Dr. Halprin was accused of improper sexual relations and improper examinations. Around that same time, Dr. Halprin began exhibiting symptoms of severe depression. Dr. Halprin began seeing John Hardy, M.D., for psychiatric care. Shortly thereafter, Dr.

Halprin ceased practicing medicine. In 1998, Dr. Halprin requested benefits under his Equitable Policy. Equitable denied Dr. Halprin's request based upon its conclusion that the request lacked proof that Dr. Halprin was under a doctor's "regular care." Equitable also concluded that the information Dr. Halprin submitted did not objectively support Dr. Hardy's diagnosis of depression. This suit followed.

## II. Equitable's Motion for Judgment on the Pleadings

Equitable first moves for judgment on the pleadings dismissing Dr. Halprin's second claim for willful and wanton breach of contract and fifth claim for negligence.

■ In support of its assertion regarding Dr. Halprin's "willful and wanton" claim, Equitable asserts that claim to be indistinguishable from Dr. Halprin's first claim for breach of contract. I agree.

Dr. Halprin argues to the contrary, asserting that a distinct willful and wanton breach of contract claim was recognized in *Giampapa v. Am. Family Mut. Ins. Co.*, 64 P.3d 230 (Colo.2003), and *Decker v. Browning–Ferris Indust.*, 931 P.2d 436 (Colo.1997). As Dr. Halprin accurately notes, the Colorado Supreme Court concluded that if a willful and wanton breach of contract is proven, the claimant may receive all non-economic damages that were foreseeable at the time of contracting and are a natural and probable result of the breach. *Giampapa*, 64 P.3d at 238. However, *Giampapa* and *Decker* contemplate the extent of damages available for a breach of contract when such a breach is willful and wanton. The cases do not create a distinct cause of action separate from common law breach of contract.

The language of *Giampapa* shows as much. For instance, *Giampapa's* introduction explains that the plaintiff sought recovery for "three types of actions":

"contract law, tort law, and the Colorado Auto Accident Reparations Act." *Id.* at 234. The Court stated, "[u]nder the contract claim specifically, the jury awarded Giampapa $ 900,000 in economic and non-economic 'special damages' for American Family's willful-and-wanton breach of contract." *Id.* It continued, "[o]n appeal today is the issue of whether Giampapa may recover complete *non-economic damages under his common law contract claim.*" *Id.* (emphasis added). The Court referred to willful and wanton breach of contract and common law breach of contract interchangeably. The claims are one and the same. Because Dr. Halprin asserts a willful and wanton breach of contract claim and a claim premised on common law breach of contract, I grant Equitable's motion for judgment on the pleadings with respect to Dr. Halprin's second claim for willful and wanton breach of contract. That claim is therefore dismissed.

Equitable also moves for judgment on the pleadings as to Dr. Halprin's fifth claim premised upon negligence. Dr. Halprin agrees that a negligence claim is not appropriate here. I therefore grant Equitable's motion with respect to Dr. Halprin's fifth claim based on negligence. Equitable's motion for judgment on the pleadings is granted. Dr. Halprin's second and fifth claims are dismissed.

### III. Equitable's Motion for Summary Judgment Pursuant to Rule 56(b)

The purpose of a summary judgment motion is to assess whether trial is necessary. *See White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995). Rule 56(b) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that it believes demonstrate the absence of genuine issues for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mares v. ConAgra Poultry Co.,* 971 F.2d 492, 494 (10th Cir. 1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. Rule 56(e); *see also Otteson v. United States,* 622 F.2d 516, 519 (10th Cir.1980). These facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

### A. ERISA Application

ERISA governs all "employee benefit plans." 29 U.S.C. § 1003(a). One form of an employee benefit plan is an "employee welfare benefit plan." *Id.* at 1002(3). An "employee welfare benefit plan" is "any plan, fund, or program ... established or maintained by an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise ... medical, surgical, or hospital care benefits or benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1).

The Tenth Circuit has broken down the definition into five elements: (1) a "plan, fund, or program"; (2) established or maintained; (3) by an employer; (4) for the purpose of providing medical, surgical, or hospital care benefits (or benefits in the event of disability); and (5) to participants or their beneficiaries. *Peckham v. Gem*

*State Mut.,* 964 F.2d 1043, 1047 (10th Cir. 1992) (citing *Donovan v. Dillingham,* 688 F.2d 1367, 1371 (11th Cir.1982)). Equitable asserts that all five elements apply to Dr. Halprin's Equitable Policy, making his Equitable Policy a "plan" within the meaning of ERISA. Dr. Halprin does not dispute the application of elements (3), (4), and (5) to his Equitable Policy. Indeed, the undisputed facts show that SCC was Dr. Halprin's employer, the Equitable Policy provides benefits for disability, and the Equitable Policy provides those benefits to its participants. Dr. Halprin does dispute, however, the application of elements (1) and (2) to his Equitable Policy. I therefore consider those elements below, after determining the "plan" to which I must apply those elements.

### 1. The Appropriate "Plan"

■ I first must consider whether the Equitable and Standard Plans compose one "plan" for the purpose of ERISA, or whether each plan is separate. Equitable cites to *Gaylor v. John Hancock Mut. Life Ins. Co.,* 112 F.3d 460 (10th Cir.1997), *Roe v. General Am. Life Ins. Co.,* 712 F.2d 450 (10th Cir.1983), and *Peckham v. Gem State Mut.,* 964 F.2d 1043 (10th Cir.1992) for the proposition that Dr. Halprin's Standard and Equitable policies incorporate into one "plan." Dr. Halprin, meanwhile, contends that his two policies compose two distinct "plans," and because of that factual dispute, genuine issues of material fact remain as to ERISA application. While I agree with Dr. Halprin that the plans are separate, I disagree with his contention that genuine issues of material fact remain concerning ERISA's application.

In *Gaylor, Peckham,* and *Roe,* the Tenth Circuit considered an employee's attempt to sever optional coverage from an employer's plan in order to exempt that coverage from ERISA application. In each instance, the Court concluded the optional coverage was a feature of the primary "Plan." *See, e.g., Gaylor,* 112 F.3d at 464. However, each of those cases involved optional coverage an employer offered as part of a single plan. Indeed, in each instance the Tenth Circuit considered additional, optional coverage under the *same insurance company. Gaylor,* 112 F.3d at 462; *Roe,* 712 F.2d at 451; *Peckham,* 964 F.2d at 1045. Here, no evidence—other than the fact the two companies issued plans for the same place of employment— links the physicians' Standard and Equitable Plans, which were maintained separately by those respective companies. Thus, the "Plan" at issue here is limited to that issued under Equitable.

But Dr. Halprin is incorrect in his assertion that genuine issues of material fact remain as to ERISA's application. The facts of this case regarding the Equitable Policy's origination, maintenance, and history are not controverted. Dr. Halprin's disagreement with Equitable regards the appropriate legal conclusion applicable to those facts: whether the Equitable Policy alone is a "plan" or whether the Equitable Policy and Standard Policy constitute a single "plan" for the purposes of determining ERISA application. Accordingly, that dispute does not make summary judgment inappropriate.

### 2. The First Element: A "Plan, Fund or Program"

■ A "plan, fund, or program" exists if "from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and the procedures for receiving benefits." *Peckham,* 964 F.2d at 1047; *Gaylor v. John Hancock Mut. Life Ins. Co.,* 112 F.3d 460, 464 (10th Cir.1997). A reasonable person could ascertain here that the intended benefit of the Equitable Policy was for extended benefits in the event of disability; that the

intended beneficiaries were an initial group of nineteen physicians at SCC as well as later joining physicians; that the financing for the plan came from the individual physicians by deduction from their individual paychecks; and that the procedures for obtaining benefits were specified in information available from the insurance provider. The Equitable Policy therefore—although individually funded and optional—is the type of "plan, fund, or program" contemplated by ERISA. *See Peckham*, 964 F.2d at 1047–48. Hence, the first element is satisfied.

### 3. The Second Element: "Established or Maintained" Requirement

■ The "established or maintained" requirement "appears designed to ensure that the plan is part of an employment relationship." *Peckham*, 964 F.2d at 1049. The requirement "seeks to ascertain whether the plan is part of an employment relationship by looking at the degree of participation by the employer in the establishment or maintenance of the plan." *Id.* (citing *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 978 (5th Cir.1991)).

In the early 1980's, Robert Redwine—an Equitable insurance agent—met with SCC's Clinic Administrator regarding what eventually became the initial Equitable Policy. Mr. Redwine and the Administrator agreed on a plan that would be offered to all doctors at the SCC. Mr. Redwine eventually participated in a meeting with the SCC Board of Directors at which he discussed the proposed policy. The Board then selected the Equitable Policy, and a group of policies were issued to all SCC doctors, including Dr. Halprin.

In the following years, SCC replaced the initial Equitable Policy with a competing policy from Lincoln National. Then, in 1989, Mr. Redwine again worked with the Clinic Administrator and designed another replacement policy from Equitable. The new policy consisted of nineteen individual policies issued together to nineteen SCC doctors. Dr. Halprin and the other physicians received a ten to twenty percent "group discount" on the premiums for the Equitable Policy.

The undisputed evidence shows SCC's direct involvement in the Equitable Policy's initiation. It shows involvement both by SCC's Clinic Administrator, as well as the Board of Directors. The evidence also shows two subsequent re-negotiations of those plans—presumably to find better rates, coverage or service. SCC's Administrator was again involved in subsequent negotiations. Finally, in 1989 all nineteen doctors switched back to Equitable. In sum, SCC's collective bargaining power helped the doctors in their insurance pursuit. That bargaining, combined with SCC's administration of payment, is the essence of participation in establishment and maintenance of this Plan that "provide[d] benefits on a regular and long term basis" to this group of employees. *Peckham*, 964 F.2d at 1049 (quoting *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1083 (1st Cir.1990)). This second element is also met. Consequently, ERISA governs the Equitable Plan.

### B. Safe Harbor Provisions

Dr. Halprin next argues that ERISA does not apply because his plan fits under ERISA's "safe harbor" provision. I disagree.

■ ERISA's "safe harbor" provision states that the term "employee welfare benefit plan" does not include programs in which (1) no contribution is made by the employer; (2) participation in the program is completely voluntary for the employees; (3) the sole functions of the employer are to permit the insurer to publicize the program to employees and to collect premiums through payroll deduction; and (4)

the employer receives no consideration in connection with the program. 29 C.F.R. § 2510.3–1(j). Plans that meet all four criteria are excluded from ERISA coverage. *Gaylor,* 112 F.3d at 463.

Element number one does not apply. As noted above, SCC made at least three significant contributions by negotiating the terms and discounted rates of the initial Equitable Policy, the Lincoln National Plan, and the subsequent Equitable Policy. Such negotiation constitutes an employer contribution. *See, e.g., Brown v. The Paul Revere Life Ins. Co.,* 2002 WL 1019021, *7 (E.D.Pa.2002).

Nor does element three apply. SCC's continued involvement in subsequent insurance carrier changes shows a function additional to publicizing and collecting premiums. In sum, the "safe harbor" provision does not apply to relieve Dr. Halprin's Equitable Policy from ERISA application.

### C. Claims Preempted

Equitable contends that ERISA preempts all of Dr. Halprin's claims. I agree.

Dr. Halprin concedes that if ERISA applies, it preempts his Colorado Consumer Protection Act ("CCPA") claim. And as noted above, because Equitable's motion for judgment on the pleadings is granted, Dr. Halprin's second claim for willful and wanton breach of contract and his fifth claim based on negligence are likewise no longer viable. Thus, two claims remain at-issue: Dr. Halprin's first claim for common law breach of contract and his third claim for bad faith breach of insurance contract ("Bad Faith" claim).

#### 1. Dr. Halprin's Third Claim for Bad Faith Breach of Insurance Contract

Congress provided that the statutory scheme of ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan ...." 29 U.S.C. § 1144(a). In addition to this express preemption language in the statute, the Supreme Court has also held that ERISA preempts state laws to the extent that they "conflict[ ] with the provisions of ERISA or operate[ ] to frustrate its objects." *Boggs v. Boggs,* 520 U.S. 833, 841, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997).

One of the principal objects of ERISA is to "establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits." *Egelhoff v. Egelhoff,* 532 U.S. 141, 148, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001). To accomplish its objectives, Congress created a "carefully integrated" civil enforcement mechanism, found at 29 U.S.C. § 1132. *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). ERISA's remedial framework is "one of the essential tools for accomplishing the stated purposes of ERISA." *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 52, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

In *Kelley v. Sears, Roebuck & Co.,* 882 F.2d 453, 456 (10th Cir.1989), the Tenth Circuit applied *Pilot Life* to conclude that ERISA preempts Colorado's common law Bad Faith claim. Because ERISA preempts "all state laws that 're-late to' any employee benefit plan," *id.* at 455–56, the court found those claims subject to ERISA. The Court then defined an exception to the preemption. It noted that even where a state law relates to an employee benefit plan, a "savings clause" may prevent preemption where the law regulates insurance. *See* 29 U.S.C. § 1144(b)(2)(A).

The savings clause, saves from preemption only those causes of action under state law that "regulate"

insurance. In making this determination, the court first considers a "common sense view" of the language of the saving clause. Second, it determines whether the cause of action falls under the "business of insurance," applying three criteria: (1) whether the state law has the effect of transferring or spreading a policyholder's risk; (2) whether the state law is an integral part of the policy relationship between the insurer and the insured; and (3) whether the state law is limited to entities within the insurance industry. *Kelley,* 882 F.2d at 456 (citing *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 1553–54, 95 L.Ed.2d 39 (1987) (internal citations omitted)).

*Kelley* concluded that the "savings clause" did not apply:

Colorado's common law of bad faith does not regulate insurance. It neither spreads policyholder risk nor controls the substantive terms of the insurance contract. Although associated with the insurance industry, this law developed from the general principles of tort and contract law. Finally, Colorado's common law of bad faith conflicts with ERISA's civil enforcement remedies. *Kelley,* 882 F.2d at 456 (citing *Pilot Life,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) (internal citations omitted)).

*Kelley* concluded that, like Mississippi's Bad Faith law in *Pilot Life,* Colorado's Bad Faith law was preempted under ERISA. *Id.*

Dr. Halprin cites *Colligan v. UNUM Life Ins. Co. of Am.,* No. 01–K–2512, 2001 WL 533742, 2001 U.S. Dist. LEXIS 8103 (D.Colo. Apr. 23, 2001), for the proposition that ERISA *does not* preempt Colorado Bad Faith claims. *Colligan*—decided after *Pilot Life* and *Kelley*—considered a Bad Faith claim's preemption in light of *Decker v. Browning–Ferris Indus. of Colo. Inc.,* 931 P.2d 436 (Colo.1997). In

*Decker*—also decided after *Pilot Life* and *Kelley*—the Colorado Supreme Court discussed the tort of Bad Faith as recognized in Colorado. Specifically, *Colligan* interprets *Decker* to have "limited the tort exclusively to the insurance context and recognized that an insurer's good-faith obligation in Colorado is grounded in 'special' and 'heightened' duties arising 'independently' from the those (sic) obligations created by the contract generally." *Colligan,* 2001 WL 533742, at *2, 2001 U.S. Dist. LEXIS 8103, at *6.

In light of the tort's limitation to the insurance industry and implication of a "heightened duty," the Court in *Colligan* re-applied the *Pilot Life* and *Kelley* factors. "Because these heightened duties govern the insurance relationship not only distinctively but exclusively, Colorado's bad faith cause of actions (sic), as a matter of common sense, regulates insurance." *Id.* (internal quotations omitted). Further, the tort,

imposes a "special duty" and creates a "special contract" within a contract when an insured suffers a loss, [the tort] "alters the allocation of risk" for which the parties originally contract and "dictates the terms" of the relationship between the insurer and the insured such that it is "integral to that relationship" as contemplated by the Act. *Id.,* 2001 WL 533742, at *2, 2001 U.S. Dist. LEXIS 8103, at *6–*7.

*Colligan* then distinguished *Pilot Life* by noting that under Mississippi law, "any breach of contract, and not merely breach of an insurance contract, may lead to liability for punitive damages. Colorado's insurance bad faith cause of action, by contrast, is explicitly limited to the insurance industry." *Id.,* 2001 WL 533742, at *3, 2001 U.S. Dist. LEXIS 8103 at *8 (internal citations omitted).

Reliance on *Colligan,* however, is problematic. To begin, *Kelley* explicitly held Colorado's Bad Faith claim subject to ERISA preemption. *Kelley,* 882 F.2d at 456. There being no Supreme Court or Tenth Circuit authority to the contrary, I am obligated to follow that precedent.

Nor do I agree with *Colligan* that *Kelley* is no longer viable. Even assuming *Decker* narrowed the Bad Faith tort, *Decker's* limitation does not negate *Kelley's* holding. The *Kelley* Court premised its ruling on the *Pilot Life* test's application. It first noted that the Bad Faith tort does not qualify as a law that regulates insurance because it does not spread policyholder risk or control the substantive terms of the insurance contract. *Kelley,* 882 F.2d at 456. Accordingly, it held, the first two *Pilot Life* factors do not apply to that tort. Even given the subsequent limitation of the Bad Faith claim's scope as described in *Decker* (excluding employment claims) and *Decker's* description of Bad Faith claims as incorporating a "heightened duty" in the insurance context, nothing in *Decker* changes *the effect the Bad Faith tort has on insurance claims* because *Decker's* limitation related only to the scope of claims to which the Bad Faith tort applies. Similarly, its "heightened burden" analysis described, but did not change, the Bad Faith tort. Thus, *Decker* did not alter the depth or terms of the Bad Faith tort's application. Accordingly, *Kelley's* application of the first two *Pilot Life* factors—even in light of *Decker*—remain unchanged.

In consideration of the third *Pilot Life* element, *Kelley* explicitly referenced the tort's application to insurance. It noted that the third element did not apply because, "[a]lthough associated with the insurance industry, this law developed from the general principles of tort and contract law." *Kelley,* 882 F.2d at 456. Again, with *Kelley's* focus being on the tort's de-

velopment, *Decker* leaves *Kelley's* reliance on that element intact.

Most convincingly, recent Tenth Circuit authority has reinforced that even if a "state law otherwise regulat[es] insurance ... [it] may still be preempted if it allows plan participants and beneficiaries to obtain remedies under state law that Congress rejected in [ERISA]." *Conover v. Aetna U.S. Health Care, Inc.,* 320 F.3d 1076, 1078 (10th Cir.2003) (internal citation omitted). In addition to *Kelley's* other reasoning, *Kelley* also concluded that "Colorado's common law of bad faith conflicts with ERISA's civil enforcement remedies." *Kelley,* 882 F.2d at 456 (citing *Pilot Life,* 107 S.Ct. at 1556–57). Thus, even if *Decker* changed the Bad Faith tort to regulate insurance, the conflict *Kelley* identified between the tort and ERISA's remedies, *Kelley,* 882 F.2d at 456, as well as the legal authority for enforcing preemption in that circumstance, *Conover,* 320 F.3d at 1078, both remain unequivocally unchanged.

In sum, I conclude that *Kelley* is still good law. Dr. Halprin's Bad Faith tort claim is preempted by ERISA.

### 2. Dr. Halprin's Breach of Contract Claim

It is well settled that ERISA preempts common law contract claims. *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 62, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). In *Taylor,* the Supreme Court noted that common law contract claims are "based upon common law of general application that is not a law regulating insurance. Accordingly, the suit is pre-empted ...." *Id.* at 62, 107 S.Ct. 1542 (internal citation omitted). Dr. Halprin does not argue to the contrary. His first claim for relief based upon breach of contract is likewise preempted by ERISA.

*D. Dr. Halprin's Assertion of Waiver*

█ Finally, Dr. Halprin asserts that Equitable waived its ERISA preemption defense by waiting until summary judgment to raise it. Again I disagree.

Dr. Halprin cites *Haller v. Hawkeye–Sec. Ins. Co.*, 936 P.2d 601, 604 (Colo.Ct. App.1997) and *Barnes v. Waco Scaffolding & Equip. Co.*, 41 Colo.App. 423, 589 P.2d 505, 507–08 (1978), for the proposition that "Colorado has long held that compliance with insurance policy provisions is subject to waiver." Indeed, the Colorado Supreme Court has stated that "[a]n insurer should raise (or at least reserve) all defenses within a reasonable time after learning of such defenses, or those defenses may be deemed waived ...." *United States Fid. & Guar. Co. v. Budget Rent–A–Car Sys., Inc.*, 842 P.2d 208, 210 n. 3 (Colo.1992).

However, unlike a contractual right that may be waived by failing to assert that contractual term for denial, *see, e.g., Colard v. American Family Mut. Ins. Co.*, 709 P.2d 11, 15 (Colo.Ct.App.1985) (defense based on failure of notice waived), Equitable's defense of ERISA preemption is premised upon statutory application. Dr. Halprin cites no authority for the proposition that ERISA preemption—or that of another statute's application—may be waived. Indeed, my research indicates support for that proposition only where the argument was first raised on appeal. *See, e.g., Dueringer v. General American Life Ins. Co.*, 842 F.2d 127, 130 (5th Cir. 1988). And, Dr. Halprin's proposition has been rejected by the District of Utah, where the Court ruled that the defendants did not waive preemption because "the Tenth Circuit has recognized that an affirmative defense can be raised [for the first time] by a motion for summary judgment." *Johnston v. Davis Sec., Inc.*, 217 F.Supp.2d 1224, 1227 (D.Utah 2002) (citing *Smith v. Spain*, No. CIV 96–2164, 1998 WL 4358, 1998 U.S.App. LEXIS 225 (10th Cir. Jan. 8, 1998)).

Thus, even if a defendant may waive a preemption defense prior to trial, Equitable's assertion in a summary judgment motion suffices for timeliness. Moreover, Equitable's tardiness is well explained. Part of Equitable's summary judgment motion is reliant on a long-disputed deposition that ultimately occurred December 19, 2002. Equitable filed its summary judgment motion on January 17, 2003—less than one month after the deposition. In sum, I decline to find that Equitable waived its ERISA preemption defense.

## IV. Equitable's Motion for Partial Summary Judgment and Dr. Halprin's Motion for Partial Summary Judgment

As noted above in Section II, Dr. Halprin's second and fifth claims for relief are dismissed pursuant to Equitable's motion for judgment on the pleadings. Pursuant to Section III, the remainder of Dr. Halprin's claims—for breach of contract, CCPA and Bad Faith, are preempted by ERISA. Equitable's motion for partial summary judgment on Dr. Halprin's Bad Faith and CCPA claims is therefore denied as moot. Dr. Halprin's motion for partial summary judgment regarding contract benefits is denied.

Accordingly, IT IS ORDERED that:

(1) Equitable's motion for judgment on the pleadings with respect to plaintiff's second and fifth claims for relief is GRANTED;

(a) Dr. Halprin's second and fifth claims for relief are DISMISSED;

(2) Equitable's motion summary judgment pursuant to Fed.R.Civ.P. 56(b) is GRANTED;

(a) Dr. Halprin's first, third, and fourth claims for relief are PREEMPTED by ERISA and therefore DISMISSED;

(3) Equitable's motion for partial summary judgment dismissing plaintiff's bad faith and CCPA claims is DENIED AS MOOT;

(4) Dr. Halprin's motion for partial summary judgment regarding entitlement to contract benefits is DENIED;

(5) This case is DISMISSED; and

(6) Costs are awarded to Equitable.