# United States Court of Appeals
## For the First Circuit

No. 12-1175

DIAHANN L. GROSS,

Plaintiff, Appellant,

v.

SUN LIFE ASSURANCE COMPANY OF CANADA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Thompson, Selya, and Lipez,
Circuit Judges.

Michael D. Grabhorn, with whom Jonathan M. Feigenbaum and Grabhorn Law Office, PLLC were on brief, for appellant.
Joshua Bachrach, with whom Wilson, Elser, Moskowitz, Edelman & Dicker LLP was on brief, for appellee.

August 16, 2013

**LIPEZ, Circuit Judge**.    This  case  requires  us  to determine, inter alia, whether the "safe harbor" exception to the Employee Retirement Income Security Act of 1974 ("ERISA") applies to the long term disability insurance policy that covers appellant Diahann Gross.   The district court found that it did not.   The court therefore held that Gross's state law claims were preempted. Furthermore, it concluded that her insurer was entitled to the highly deferential "arbitrary and capricious" review prescribed for certain ERISA benefits decisions.   Using that standard, the court upheld the insurer's denial of benefits to Gross.

On appeal, Gross asserts that the district court triply erred.   She first argues that the safe harbor exception applies, removing her benefits claim from the ERISA scheme.   She further maintains that, even accepting that ERISA governs, the court reviewed the insurer's decision under the wrong standard and -- even under that standard -- reached the wrong result.

Each of appellant's contentions raises a substantial question.   Although we agree with the district court that the safe harbor exception is inapplicable, we hold that the benefits denial was subject to de novo review.   Joining several other circuits, we conclude that language requiring proof of disability "satisfactory to us" is inadequate to confer the discretionary authority that would trigger deferential review.   We also conclude that the administrative  record  is  inadequate  to  allow  a  full  and  fair

assessment of Gross's entitlement to disability benefits.  Hence, we vacate the judgment and remand the case to the district court so that it may return the matter to Sun Life for further development of the record as described below.

**I.**

In reciting the facts germane to resolution of this ERISA appeal, we draw on the record that was before the claims administrator.  <u>Buffonge</u> v. <u>Prudential Ins. Co. of Am.</u>, 426 F.3d 20, 22 (1st Cir. 2005).

**A. Background**

Appellant Gross, an optician and office manager for Pinnacle Eye Care LLC in Lexington, Kentucky, was placed on disability leave in early August 2006, when she was 34 years old. She complained of severe pain, weakness and numbness in her legs and arms, and recurring headaches that had been worsening since early 2004.  Gross's treating physician concluded that she had reflex sympathetic dystrophy ("RSD"),[1] fibromyalgia, migraines, and chronic fatigue.  In a report signed in September 2006, the doctor wrote that Gross "cannot work."

Gross is covered under a long term disability ("LTD") policy that Pinnacle obtained from Medical Group Insurance Services, Inc. ("MGIS"), a company that sells employee benefit

---

[1] RSD is apparently considered equivalent to complex regional pain syndrome, or "CRPS," and we thus refer to the two conditions interchangeably.

-3-

coverage provided by the United Health Services Employer's Trust ("the Trust"). Pinnacle had obtained group policies from the Trust, through MGIS, since 2003,[2] with the policies originally written by The Hartford Life & Accident Insurance Company ("Hartford") and, beginning in 2006, by appellee Sun Life Assurance Company of Canada. Pinnacle paid 100 percent of its employees' premiums for life and accidental dismemberment and death ("AD&D") insurance, but the employees themselves paid for LTD coverage. Despite the payment differences, the policies were administered under the same group number, MGIS Group. No. 20178808, and all of the coverage was billed to Pinnacle in a single monthly statement.[3]

Shortly after leaving her job, Gross filed a claim with MGIS seeking long term disability benefits. The administrative record includes voluminous medical evidence, some submitted by Gross to support her application for benefits and some solicited by Sun Life to aid in its evaluation. Sun Life also hired an investigator to perform a background check and video surveillance on Gross. In April 2007, Sun Life notified Gross that it had denied her request for benefits because of "insufficient objective evidence to substantiate" a disability that precluded her from

_____

[2] The Trust provides group life, accidental death, and disability insurance.

[3] The monthly statements indicate that Pinnacle arranged for short term, as well as long term, disability coverage. We are unable to determine from the record who pays for the short term coverage.

-4-

performing her duties at Pinnacle.  In so concluding, the insurer relied, inter alia, on its video surveillance and the opinions of consulting physicians who reviewed Gross's medical history but did not physically examine her.  Gross filed an administrative appeal, which Sun Life rejected in January 2008 with the explanation that it had found "no basis on which to conclude that Ms. Gross would be unable to perform the Material and Substantial Duties of her Own Occupation."  Sun Life emphasized the discrepancy between Gross's activities while under surveillance and her appearance and behavior during medical visits.

**B. Procedural History**

Gross initially filed a lawsuit against Sun Life in Kentucky state court challenging the insurer's denial of benefits on state law grounds, but later dismissed that action without prejudice.  In September 2009, she filed suit in Norfolk County Superior Court in Massachusetts, again alleging only state law causes of action.[4]  Sun Life removed the new action to federal district court and filed a motion to dismiss based on ERISA preemption.  After the court ruled in Sun Life's favor, Gross amended her complaint to add claims under 29 U.S.C. § 1132, which, among other things, provides a cause of action for an ERISA plan

---

[4] Gross evidently chose to file her original lawsuit in Kentucky because she lives there. After Sun Life removed that action to federal court, Gross dismissed it and filed a new complaint in the Massachusetts county where Sun Life maintains its principal United States place of business.

participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

In February 2011, Gross filed a motion asking that the district court apply de novo review in its evaluation of her ERISA claims, based on the Supreme Court's decision in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989). See id. at 115 (stating that the default standard for ERISA claims is de novo). The court denied the motion, and cross motions for summary judgment followed. On January 6, 2012, the district court granted summary judgment for Sun Life and denied Gross's parallel motion. The court held that Sun Life's decision to deny benefits was not arbitrary and capricious, and thus complied with ERISA's requirements. In so ruling, the court noted that plan administrators "'are not obligated to accord special deference to the opinions of treating physicians,'" Gross v. Sun Life Assurance Co. of Canada, No. 09-11678-RWZ, 2012 WL 29061, at *4 (D. Mass. Jan. 6, 2012) (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 (2003)), and that "even 'sporadic surveillance capturing limited activity' may be used to uphold termination of benefits, particularly where videos show plaintiff engaging in activities that specifically contradict her claims as to 'how she spent her time and what [actions] she could tolerate,'" id. at *5 (quoting Maher v. Mass.

-6-

Gen. Hosp. Long Term Disability Plan, 665 F.3d 289, 295 (1st Cir. 2011)).

On appeal, Gross asserts that the district court incorrectly found that: (1) her long term disability policy was part of an ERISA plan; (2) the plan gave Sun Life discretionary authority to make claims decisions, thus allowing only arbitrary and capricious review of the insurer's rejection of benefits; and (3) Sun Life permissibly exercised its discretion in denying benefits to her. We begin as we must with Gross's contention that her claims do not fall under ERISA.

## II.

A finding that ERISA governs a benefits plan typically will impact a plaintiff's appeal of her insurer's denial of benefits in ways that will make that challenge more difficult. See Johnson v. Watts Regulator Co., 63 F.3d 1129, 1131-32 (1st Cir. 1995). The application of ERISA triggers preemption of state-law principles, see 29 U.S.C. § 1144(a), which "may cause potential state-law remedies to vanish, or may change the standard of review, or may affect the admissibility of evidence, or may determine whether a jury trial is available." Watts Regulator, 63 F.3d at 1131-32 (citations omitted); see also Aetna Health Inc. v. Davila, 542 U.S. 200, 215 (2004) ("The limited remedies available under ERISA are an inherent part of the 'careful balancing' between ensuring fair and prompt enforcement of rights under a plan and the

encouragement of the creation of such plans." (quoting <u>Pilot Life Ins. Co.</u> v. <u>Dedeaux</u>, 481 U.S. 41, 55 (1987)). Gross's vigorous opposition to applying ERISA to her claim is therefore unsurprising.

With exceptions not pertinent here, ERISA applies to "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce or in any industry or activity affecting commerce."  29 U.S.C. § 1003(a)(1).[5]  We have observed that "the existence of a plan turns on the nature and extent of an employer's benefit obligations," <u>Belanger</u> v. <u>Wyman-Gordon Co.</u>, 71 F.3d 451, 454 (1st Cir. 1995), and, accordingly, the two common ways to show that a benefits decision falls outside ERISA both involve inquiry into the employer's relationship with the benefits under scrutiny.  First, the regulatory "safe harbor" provision excludes "group or group-type insurance programs" from ERISA's oversight if they satisfy four criteria:

> (1) the employer makes no contributions on behalf of its employees;
>
> (2) participation in the program is voluntary;
>
> (3) the employer's sole functions are to collect premiums and remit them to the insurer, and, without endorsing the program, to allow the insurer to publicize the program to its employees; and

---

[5] ERISA also applies to plans established or maintained by employee organizations or "organizations representing employees engaged in commerce or in any industry or activity affecting commerce."  29 U.S.C. § 1003(a)(2).

-8-

> (4) the employer receives no consideration for its efforts, other than reasonable compensation for administrative services necessary to collect premiums.

See 29 C.F.R. § 2510.3-1(j); see also Watts Regulator, 63 F.3d at 1133.

A benefits program that fails the safe harbor test will not necessarily be deemed an ERISA plan, however. Watts Regulator, 63 F.3d at 1133. Exemption also may result from application of "the conventional tests" for determining whether ERISA governs. Id. An ERISA welfare benefit plan has "five essential constituents":

> (1) a plan, fund or program (2) established or maintained (3) by an employer or by an employee organization, or by both (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment or vacation benefits, apprenticeship or other training programs, day care centers, scholarship funds, prepaid legal services or severance benefits (5) to participants or their beneficiaries.

Wickman v. Nw. Nat'l Ins. Co., 908 F.2d 1077, 1082 (1st Cir. 1990) (quoting Donovan v. Dillingham, 688 F.2d 1367, 1370 (11th Cir. 1982) (en banc)). We have observed that "[t]he crucial factor in determining if a 'plan' has been established is whether the purchase of the insurance policy constituted an expressed intention by the employer to provide benefits on a regular and long term basis." Id. at 1083. The inquiry is performed from the perspective of a reasonable person: "[A] 'plan, fund or program'

-9-

under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits."  Id. at 1082 (quoting Donovan, 688 F.2d at 1373).

Thus, even if the Sun Life policy does not fall within the regulatory safe harbor, we must separately determine if it was a "plan" or "program" that was "established or maintained" by Pinnacle.  Although we often start with the safe harbor inquiry, we begin here by examining whether Pinnacle's benefits arrangement is properly classified as an ERISA plan because that sequence better fits our analysis.

## A. Standard of Review

Although the district court's refusal to remand this case to state court was a ruling on subject-matter jurisdiction engendering de novo review, see Samaan v. St. Joseph Hosp., 670 F.3d 21, 27 (1st Cir. 2012); BIW Deceived v. Local S6, Indus. Union of Marine & Shipbuilding Workers of Am., 132 F.3d 824, 830 (1st Cir. 1997), the underlying jurisdictional issue -- whether ERISA governs the Pinnacle plan -- is a mixed question of fact and law triggering scrutiny "along a degree-of-deference continuum," Watts Regulator, 63 F.3d at 1132.  Where, as here, factual questions about the plan dominate the inquiry, the clear-error standard will be our primary tool.  See id.  We keep in mind, however, that "the

removing party bears the burden of persuasion vis-à-vis the existence of federal jurisdiction." BIW Deceived, 132 F.3d at 831.

**B. Existence of an ERISA Plan**

The record demonstrates beyond debate that the "crucial factor" we identified in Wickman is satisfied here, i.e., that Pinnacle undertook to provide benefits for its employees "on a regular and long term basis." 908 F.2d at 1083; see also, e.g., Anderson v. UNUM Provident Corp., 369 F.3d 1257, 1263 (11th Cir. 2004) ("[T]he 'established or maintained' requirement is designed to ensure that the plan is part of an employment relationship . . . ." (alteration in original) (internal quotation marks omitted)). Pinnacle has participated in the United Health Services Employer's Trust since at least October 2003, when the company and MGIS representatives signed a one-page "Group Benefit Summary" issued by the Trust that described the life, accidental death, and LTD coverages available to Pinnacle's employees and their beneficiaries.[6] So far as the record shows, each of those benefits has been offered to employees or provided at no cost on an ongoing basis since that time.

Gross does not address ERISA's applicability to Pinnacle's insurance benefits generally, but focuses instead on the

---

[6] The Trust also provided short-term disability coverage for Pinnacle. The "Remarks" section of the Group Benefit Summary directs the reader to "[s]ee [the] attached addendum for Short Term Disability benefits." The addendum is not in the record.

-11-

LTD policy. Emphasizing that the LTD policy is the only one the employees must pay for themselves,[7] she seeks to divorce that policy from any benefit "program" and have us separately evaluate whether ERISA applies to it. The district court, however, viewed the LTD policy as one part of a "comprehensive employee benefit plan." Gross v. Sun Life Assurance Co. of Can., No. 09-11678-RWZ, 2010 WL 817409, at *2 (D. Mass. March 4, 2010). We detect no clear error in that conclusion. As detailed below, the record provides ample support for the court's finding that Pinnacle's package of insurance benefits constituted a unitary ERISA program.[8]

Significantly, the Trust identifies all of the Pinnacle employee policies by a single group number. In addition, as noted above, the Group Benefit Summary issued by the Trust referred to all of those policies. Paul Wedge, the "owner-member" of Pinnacle who signed the Summary on behalf of the employer, is noted on the

---

[7] As noted earlier, the record does not reveal whether Pinnacle funded its employees' short-term disability coverage, although the district court stated that, while Gross paid her own LTD premium, Pinnacle funded "all the others." Gross v. Sun Life Assurance Co. of Can., No. 09-11678-RWZ, 2010 WL 817409, at *1 (D. Mass. March 4, 2010).

[8] Gross points to a statement by Paul Wedge of Pinnacle that the company did not intend to create an ERISA welfare benefits plan. The question, however, is not the employer's intent vis-à-vis ERISA, but whether the employer "intended to establish or maintain a plan to provide benefits to its employees as part of the employment relationship." Anderson, 369 F.3d at 1264; see also, e.g., Watts Regulator, 63 F.3d at 1136 n.5 (discussing the Safe Harbor elements and noting that "this case turns on the employer's activities, not its intentions").

document as the administrative contact, without distinction among policies. Similarly, invoices sent to Pinnacle by MGIS in 2006 list the life, AD&D, LTD, and short-term disability policies with the amounts due for each. The record also contains an "Employer's Participation Agreement," signed by Wedge in 2006, requesting membership in the Trust "and coverage under the Group Policies issued to the Trustees of the Trust now in effect or later modified or replaced," again without distinction among the different types of insurance offered by the Trust.

The Trust polices have thus consistently been treated as a unit, despite their different contribution requirements. Moreover, the information provided to employees was in keeping with that approach. The record contains single-page summary fliers for the life insurance and LTD coverages that are similar in appearance, both containing the Sun Life logo in the upper right corner and both offering "Highlights" of the particular policy "for Employees of Pinnacle Eye Care, LLC." The disability flier contains instructions on how to enroll, directs employees to return the form to their employer, and tells them that they "must elect or refuse insurance coverage within 31 days of your date of eligibility" -- creating an explicit link between that form of insurance and Pinnacle notwithstanding the employer's lack of financial involvement. The link is reinforced by the requirement that an enrolling employee acknowledge the following understanding:

"I am requesting LTD coverage under a Group Insurance policy offered by my employer. This coverage will end when my employment terminates." Yet another indicator of Pinnacle's role is the fine print at the bottom of the flier describing the LTD coverage as a "benefit[] available from your employer" and advising employees that Pinnacle will provide a copy of Sun Life's LTD booklet with complete details "[w]hen you become eligible for benefits under the plan."

In these circumstances, we see no justification for isolating the long-term disability policy from Pinnacle's insurance package for purposes of our ERISA inquiry. A "plan" under ERISA may embrace one or more policies, see Donovan, 688 F.2d at 1373 (noting that a benefits plan or program may consist of "a group policy or multiple policies"), quoted in Wickman, 908 F.2d at 1083, and it strikes us as both impractical and illogical to segment insurance benefits that are treated as a single group and managed together, potentially placing some under ERISA and some outside the statute's scope. In so concluding, we join several other courts that have declined to "unbundle[]" a set of policies or benefits offered by an employer to its employees when evaluating whether ERISA governs. Postma v. Paul Revere Life Ins. Co., 223 F.3d 533, 538 (7th Cir. 2000); see also Gaylor v. John Hancock Mut. Life Ins. Co., 112 F.3d 460, 463 (10th Cir. 1997) (rejecting plaintiff's attempt to "sever her optional disability coverage from the rest of

-14-

the benefits she received through her employer's plan");[9] <u>Peterson</u> v. <u>Am. Life & Health Ins. Co.</u>, 48 F.3d 404, 407 (9th Cir. 1995) (concluding that policy that did not on its own comply with ERISA requirements nonetheless fell under the statute because it "was just one component of [the] employee benefit program and . . . the program, taken as a whole, constitutes an ERISA plan");[10] <u>Pando</u> v. <u>Prudential Ins. Co. of Am.</u>, 511 F. Supp. 2d 732, 736 (W.D. Tex. 2007) ("[W]here the employer contributes to some, but not all, benefits which arise from the employment relationship, a court will separately evaluate whether a particular policy is an ERISA plan

---

[9] Gross asserts that <u>Postma</u> and <u>Gaylor</u> are distinguishable because the companies in each instance paid the premiums for all of the policies.  She is correct that, in <u>Postma</u>, the employer took over paying the LTD premium from the employees.  <u>See</u> 223 F.3d at 537-38. The circumstances in <u>Gaylor</u> are less clear.  The opinion states in one place that the employer contributed part of the LTD premium "for certain employees," 112 F.3d at 462, but elsewhere indicates that the plaintiff paid the full cost of her coverage, <u>see</u> <u>id.</u> at 463.  Regardless of these distinctions, the pertinent point is that "the disability policy was part of a broader benefits package maintained by [the employer] for its employees." <u>Postma</u>, 223 F.3d at 538.

[10] In <u>Peterson</u>, the policy at issue would not on its own have qualified as an ERISA plan because coverage was provided only to a partner in a business partnership and not to any employees. <u>See</u> 48 F.3d at 407 (citing 29 C.F.R. § 2510.3-3(b)).  We offer no view on the <u>Peterson</u> court's conclusion that a policy ineligible for ERISA coverage may nevertheless be governed by the statute if it is part of an ERISA-covered employee benefit program.  In a somewhat similar context -- where the benefit at issue (reimbursement for educational expenses) is not among those protected by ERISA -- the Eleventh Circuit held that the benefit's inclusion in a plan providing ERISA-covered employee benefits did not bring the non-ERISA benefit within the statute's scope.  <u>See</u> <u>Kemp</u> v. <u>IBM Corp.</u>, 109 F.3d 708, 713 (11th Cir. 1997).

-15-

only when it is clearly separate from the benefits plan to which the employer does contribute."); cf. Smith v. Jefferson Pilot Life Ins. Co., 14 F.3d 562, 567 (11th Cir. 1994) (rejecting plaintiff's attempt "to sever the dependent coverage feature from the benefits package provided . . . through the Plan").[11]

Having concluded that the LTD policy must be treated as part of Pinnacle's longstanding insurance benefits program, we also conclude that a reasonable person could readily ascertain the program's specific elements -- the benefits, the class of beneficiaries, the source of funding, and procedures for obtaining benefits. See Wickman, 908 F.2d at 1082. The one-page Highlights fliers for the LTD and the combined life and AD&D insurance policies generally describe the benefits, costs, and enrollment procedure, and they direct employees to Sun Life's detailed booklets for "complete plan details." The life insurance flier notes that eligible employees will need to designate beneficiaries using one of two identified forms, and the LTD flier states that

_____

[11] As the Eleventh Circuit noted in Smith, 14 F.3d at 567 n.3, the Supreme Court, in a different context, has recognized the importance of treating benefits plans holistically. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 107-108 (1983) ("The administrative impracticality of permitting mutually exclusive pockets of federal and state jurisdiction within a plan is apparent."); see also Smith, 14 F.3d at 567 n.3 (stating that, based on Shaw, "we may infer that, generally, ERISA plans may not be severed so that portions of them may be excluded from regulation under ERISA").

the benefits are "[a]vailable to all full time employees working 30 or more hours per week."

Also in the record is an individualized LTD "Benefit Highlights" form prepared for Gross that lists pertinent details of the Sun Life policy, among them the waiting period for eligibility ("1st of the month following full-time employment"); the benefit percentage of earnings (sixty percent); the maximum monthly benefit ($9,000); and the elimination period (180 days). Sun Life's forty-seven page LTD booklet contains instructions on filing a claim and explains the appeals process, including "your right to bring a civil action under ERISA, § 502(a) following an adverse determination on review." See Wickman, 908 F.2d at 1083 (noting that handbook detailing ERISA rights, distributed to employees, "is strong evidence that the employer has adopted an ERISA regulated plan"); cf. Thompson v. Am. Home Assurance Co., 95 F.3d 429, 437 (6th Cir. 1996) (noting, among facts undermining finding of employer endorsement, that "[t]he policy documentation . . . nowhere mentions that the policy is subject to ERISA" nor describes employee's ERISA rights).

In combination, the documents in the record associated with Pinnacle's employee benefits program establish all five of the constituent elements of an ERISA plan listed in Wickman: (1) a plan, (2) established and maintained (3) by an employer (4) to provide multiple types of insurance benefits (5) to employees and,

-17-

in some cases, their beneficiaries.[12]  The materials further show that a reasonable Pinnacle employee would understand the nature of the plan, including the scope of coverage, the costs for the plan's different components, and the claims procedures.  Inescapably, Pinnacle's arrangement with MGIS and the Trust represented a "calculated commitment to qualified employees for similar benefits regularly in the future."  <u>Wickman</u>, 908 F.2d at 1083.  We therefore conclude that Pinnacle offered LTD benefits to its employees under a "plan" or "program" that is subject to ERISA.

## C. The Safe Harbor Exception

Gross's argument that the safe harbor exception applies depends on her assumption that the LTD policy may be examined independently from the rest of Pinnacle's insurance benefits plan. Based on that assumption, she asserts that three of the four safe harbor requirements are clearly met: Pinnacle does not contribute to her LTD policy, her participation was voluntary, and Pinnacle did not receive any consideration in connection with the sale of the LTD policy to its employees.  <u>See</u> <u>Watts Regulator</u>, 63 F.3d at 1133.  She states that only the fourth requirement -- that the

---

[12] An ERISA plan may be created without formal documentation. <u>See</u> <u>Donovan</u>, 688 F.2d at 1372 (noting that "[t]here is no requirement of a formal, written plan in either ERISA's coverage section . . . or its definitions section"); <u>see</u> <u>also</u> <u>N.E. Mut. Life Ins. Co.</u> v. <u>Baiq</u>, 166 F.3d 1, 5 n.6 (1st Cir. 1999) (citing <u>Donovan</u>).

employer's sole functions are administrative and do not reflect endorsement of the policy -- is "reasonably in dispute."

Our rejection of Gross's assumption that Pinnacle provided multiple, independent plans is fatal to her safe harbor argument. The exception does not apply unless all four requirements are met, id., and Pinnacle's full funding of the life and AD&D insurance is thus sufficient to disqualify the Pinnacle plan. In addition, with respect to the "endorsement" criterion, the Pinnacle plan falls short as well. Our discussion above shows the close relationship between the LTD plan and the other Pinnacle insurance benefits, which were treated alike except for who paid the premiums. In an affidavit, Pinnacle's Wedge stated that the employer "did not negotiate the terms of the voluntary long term disability insurance policy from Sun Life." Although the employer did not specify the policy's terms, MGIS's benefits manager reported that Pinnacle did provide guidelines for eligibility, submitting "a list of eligible employees as well as class definitions, classes for each employee, plan waiting periods, and plan designs."

Thus, eligibility for this LTD policy was not only tied to employment at Pinnacle, but Pinnacle also determined which employees had access to that benefit. Consequently, both in outward appearance and internally, Pinnacle played more than a bystander's role concerning the LTD policy. See Watts Regulator,

-19-

63 F.3d at 1134 (linking endorsement to the employer's "engagement in activities that would lead a worker reasonably to conclude that a particular group insurance program is part of a benefit arrangement backed by the company"); Thompson, 95 F.3d at 436 (holding that a finding of endorsement may be appropriate "where the employer plays an active role in . . . determining which employees will be eligible for coverage"); ERISA Op. Letter No. 94-26A, 1994 WL 369282, at *3 (July 11, 1994) (stating that endorsement occurs "if the [employer] engages in activities that would lead [an employee] reasonably to conclude that the program is part of a benefit arrangement established or maintained by the [employer]").

In short, because Pinnacle's insurance benefits program is an ERISA plan, and the safe harbor exception is inapplicable, we must determine the proper ERISA standard of review.

## III.

### A.  Background

The question of what standard of review is applicable to a benefits decision governed by ERISA is an issue of law that we review de novo.  Maher, 665 F.3d at 291.  The default standard for reviewing benefits decisions also is de novo, and plenary review is displaced only if the benefit plan gives discretionary authority to the administrator or fiduciary to determine eligibility for benefits.  See Firestone, 489 U.S. at 115; Maher, 665 F.3d at 291.

If the plan affords such discretion, the court applies "a deferential 'arbitrary and capricious' or 'abuse of discretion' standard." Maher, 665 F.3d at 291 (quoting Cusson v. Liberty Life Assurance Co. of Bos., 592 F.3d 215, 224 (1st Cir. 2010)).[13]

The district court summarily denied Gross's motion seeking application of de novo review. Sun Life urges us to affirm that ruling, arguing that the LTD policy contains sufficiently clear language granting discretionary authority to the insurer and that Pinnacle accepted that language, and the resulting deferential review of benefits decisions, when it signed the Employer's Participation Agreement with the Trust.[14] Sun Life points specifically to two statements in the policy: "Proof [of claim] must be satisfactory to Sun Life" and "Benefits are payable when Sun Life receives satisfactory Proof of Claim." Sun Life relies on our decision in Brigham v. Sun Life of Canada, 317 F.3d 72 (1st Cir. 2003), where we accepted the view that language in a different Sun Life policy comparable to the pertinent language here

---

[13] The parties' arguments on this issue rely on the language contained in a booklet that is described therein as "intended to provide a summarized explanation of the current Group Policy Benefits." The booklet warns that "the Group Policy is the document which forms Sun Life's contract to provide benefits." Because the parties do not assert otherwise, we presume that the language in the booklet and the language in the policy are the same for our purposes.

[14] The Agreement states, inter alia, that "upon acceptance for participation under the policies, Participant will be bound by the terms of this Request form and Policies."

constituted "an indicator of subjective, discretionary authority on the part of the administrator."  Id. at 81.

Although Sun Life is correct that the language at issue in Brigham is similar to the language now before us,[15] two factors important to our decision in Brigham are absent here.  First, plaintiff Brigham advocated for de novo review for the first time on appeal, having assumed throughout the district court proceedings that the arbitrary and capricious standard applied.  We saw no injustice in rejecting Brigham's belated argument based on our well established raise or waive rule, and without "undertak[ing] a thorough exploration of the issue," in light of the "widespread acceptance" by courts at that time that the phrase "satisfactory to us" triggers discretionary review.  Id. at 82.

Since our decision in Brigham, however, the precedential landscape -- the second important factor -- has changed.  In Brigham, decided more than a decade ago, we noted the split in the circuits on whether policy provisions containing a "satisfaction" requirement were sufficient to confer discretionary authority triggering deferential review.  Id. at 81-82.  We reported that some circuits considered the use of "to us" after "satisfactory" to

---

[15] To the extent it differs, the Brigham language is more expansive.  The Sun Life policy there stated that the insurer "'may require proof in connection with the terms or benefits of [the] Policy'" and further declared: "'If proof is required, we must be provided with such evidence satisfactory to us as we may reasonably require under the circumstances.'" Brigham, 317 F.3d at 81 (alteration in original) (emphasis removed).

be "an indicator of subjective, discretionary authority on the part of the administrator, distinguishing such phrasing from policies that simply require 'satisfactory proof' of disability, without specifying who must be satisfied." Id. at 81 (citing, inter alia, Nance v. Sun Life Assurance Co. of Can., 294 F.3d 1263, 1267-68 (10th Cir. 2002); Ferrari v. Teachers Ins. & Annuity Ass'n, 278 F.3d 801, 806 (8th Cir. 2002)). Only the Sixth Circuit, in an 8-6 en banc decision, had held that discretionary review is triggered by a requirement of "'satisfactory proof' without specification of who must be satisfied." Id. at 81-82 (citing Perez v. Aetna Life Ins. Co., 150 F.3d 550, 556-58 (6th Cir. 1998) (en banc)). The Second Circuit, in dicta, stood alone in suggesting that the "satisfactory to us" language might not convey discretion. Id. at 82 (citing Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 252 (2d Cir. 1999)).

Although the division of opinion remains, three circuits have in the interim adopted the Second Circuit's suggestion that the "to us" amplification on "satisfactory" is inadequate in itself to confer discretion. See Viera v. Life Ins. Co. of N.A., 642 F.3d 407, 414-417 (3d Cir. 2011) (describing cases); Feibusch v. Integrated Device Tech., Inc. Emp. Benefit Plan, 463 F.3d 880, 884 (9th Cir. 2006); Diaz v. Prudential Ins. Co. of Am., 424 F.3d 635, 639-40 (7th Cir. 2005). In reaching that conclusion, the Seventh Circuit panel departed from its own prior precedent and thus

submitted its proposed decision to all active judges before it was published. No judge requested en banc review. See Diaz, 424 F.3d at 640. On the other hand, at least one circuit has reaffirmed its earlier view that a plan requiring submission of "'satisfactory proof of Total Disability to [the plan administrator]'" granted discretion to the administrator. See Tippitt v. Reliance Standard Life Ins., 457 F.3d 1227, 1233-34 (11th Cir. 2006) (quoting Levinson v. Reliance Standard Life Ins., 245 F.3d 1321, 1324-25 (11th Cir. 2001)).

The procedural backdrop of Brigham and the intervening circuit court decisions mean that the standard of review issue in this case cannot be resolved, as Sun Life cursorily asserts, on the ground that it is governed by Brigham. That decision explicitly relied on the plaintiff's procedural default, which we declined to sidestep because of the then-current state of the law: "[W]ith the possible exception of the Second Circuit in dicta, no federal appeals court has viewed the type of language at issue in this case as inadequate to confer discretion on the plan administrator." 317 F.3d at 82. Here, where we do not have procedural default and we do have out-of-circuit precedent rejecting the adequacy of "satisfactory to us," our acceptance of the language in Brigham is not binding. Rather, the time is now appropriate for the "thorough exploration of the issue" that we put off in Brigham, 317 F.3d at 82.

## B.  The Pursuit of Clarity

We have long recognized that the threshold question in determining the standard of review is whether the provisions of the benefit plan at issue "reflect a <u>clear</u> grant of discretionary authority to determine eligibility for benefits."  <u>Leahy</u> v. <u>Raytheon Co.</u>, 315 F.3d 11, 15 (1st Cir. 2002) (emphasis added).  In <u>Leahy</u>, for example, we observed that the "discretionary grant hardly could be clearer" where the plan documents gave the insurer "'the exclusive right, in [its] sole discretion, to interpret the Plan and decide all matters arising thereunder,'" and further provided that the insurer's decision "in the exercise of that authority 'shall be conclusive and binding on all persons unless it can be shown that the . . . determination was arbitrary and capricious.'"  <u>Id.</u> (alteration and omission in original); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Twomey</u> v. <u>Delta Airlines Pilots Pension Plan</u>, 328 F.3d 27, 31 (1st Cir. 2003) (giving administrative committee "'such duties and powers as may be necessary to discharge its responsibilities under the Plan, including . . . decid[ing] all questions of eligibility of any Employee . . . to receive benefits,'" with such decisions, assuming good faith, "'to be final and conclusive'" (first omission and alteration in original)).

The wording at issue here is obviously a far cry from the explicit provisions in <u>Leahy</u> and <u>Twomey</u>.  There are no required "magic words," however, to confer discretion, and "language that

-25-

falls short of th[e] ideal" can suffice.  <u>Brigham</u>, 317 F.3d at 81.

Here, the two pertinent sentences appear in a section of the LTD

insurance booklet in which a series of questions about claims

procedures are asked and answered.  The first three questions

address how a claim is submitted.  The next question asks "What is

considered Proof of Claim?"  The response includes one of the

sentences under scrutiny:

> Proof of Claim must consist of at least the
> following information:
> -a description of the disability;
> -the date the disability occurred; and
> -the cause of the disability.
>
> Proof of claim may include, but is not limited
> to, police accident reports, autopsy reports,
> laboratory results, toxicology results,
> hospital records, x-rays, narrative reports,
> or other diagnostic testing materials as
> required.
>
> Proof of Claim for disability must include
> evidence demonstrating the disability
> including, but not limited to, hospital
> records, Physician records, Psychiatric
> records, x-rays, narrative reports, or other
> diagnostic testing materials as appropriate
> for the disabling condition.
>
> Sun Life may require as part of the Proof,
> authorizations to obtain medical and non-
> medial information.
>
> Proof of your continued disability and regular
> and continuous care by a Physician must be
> given to Sun Life within 30 days of the
> request for proof.
>
> Proof must be **satisfactory to Sun Life.**

App. at 250 (emphasis added).  The next question in sequence asks when benefits will be received, with this response: "Benefits are payable when Sun Life receives **satisfactory** Proof of Claim."  Id. (emphasis added).

We note initially that the second reference to satisfactory proof lacks the "to us" modifying phrase and is thus used in a way that, as we noted in Brigham, most courts consider inadequate to signify discretionary authority.  See 317 F.3d at 81; see also Viera, 642 F.3d at 414.  We agree, and we therefore focus on the "satisfactory to us" (here, "satisfactory to Sun Life") formulation.

The courts deeming even the "to us" wording insufficiently explicit have offered several justifications for their conclusions.  The Second Circuit observed that specifying the need to satisfy the administrator adds nothing to the obvious point that "[n]o plan provides benefits when the administrator thinks that benefits should not be paid."  Kintsler, 181 F.3d at 252. That assessment was echoed in Diaz: "All plans require an administrator first to determine whether a participant is entitled to benefits before paying them; the alternative would be to hand money out every time someone knocked on the door, which is obviously out of the question."  424 F.3d at 637.  According to these courts, there must be language that "unambiguously indicate[s] that the plan administrator has authority, power, or

-27-

discretion to determine eligibility or to construe the terms of the Plan." Feibusch, 463 F.3d at 884 (internal quotation marks omitted); see also Viera, 642 F.3d at 417 (stating that in order for a plan to be insulated from de novo review, it must reveal that the administrator "'has the power to interpret the rules, to implement the rules, and even to change them entirely'" (quoting Diaz, 424 F.3d at 639)); Diaz, 424 F.3d at 639-40 ("[T]he critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case.").

Both the Ninth and Seventh Circuits emphasized that the "satisfactory to us" construct fails to alert plan participants to the administrator's discretion because it is ambiguous as to what must be satisfactory to Sun Life. When faced with language and context virtually identical to that before us -- also in a Sun Life policy -- the Ninth Circuit easily dismissed the wording as inadequate:

> [T]he Sun Life policy language simply does not clearly indicate that Sun Life has discretion to grant or deny benefits. Indeed, the language makes no reference whatsoever to granting or denying benefits, and is included under the policy heading "What is considered proof of claim?" We construe ERISA policy ambiguities in favor of the insured.

<u>Feibusch</u>, 463 F.3d at 884.  The Seventh Circuit likewise found the "satisfactory to us" phrase ambiguous, observing that,

> [f]airly read, it suggests only that the plan participant must submit reliable proof of two things: continuing disability and treatment by a doctor.  In short, under [the policy], the only discretion reserved is the inevitable prerogative to determine what <u>forms</u> of proof must be submitted with a claim -- something that an administrator in even the most tightly restricted plan would have to do.

<u>Diaz</u>, 424 F.3d at 639; <u>see</u> <u>also</u> <u>Viera</u>, 642 F.3d at 417 (observing that "the only discretion reserved by this single phrase, nested within a section wholly regarding the procedural requirements for submission of a claim, is 'the inevitable prerogative to determine what <u>forms</u> of proof must be submitted with a claim'" (quoting <u>Diaz</u>, <u>supra</u>)).[16]

All four courts rejecting the adequacy of "satisfactory to us" recommended the use of language that either explicitly "stat[es] that the award of benefits is within the discretion of the plan administrator or . . . is plainly the functional equivalent of such wording," and three of the courts proposed

_____

[16] The policy at issue in <u>Viera</u> covered accidental death and dismemberment.  The pertinent language appeared in a section labeled "Proof of Loss" and stated: "'Written or authorized electronic proof of loss <u>satisfactory to Us</u> must be given to Us at Our office, within 90 days of the loss for which claim is made.'" 642 F.3d at 411.  The court explained the ambiguity in the language as follows: "In other words, it is not clear whether 'satisfactory to Us' means 'electronic proof of loss [in a form] satisfactory to Us' or 'electronic proof of loss [substantively and subjectively] satisfactory to Us.'"  <u>Id.</u> at 417.

-29-

specific language. <u>Kinstler</u>, 181 F.3d at 252; <u>see</u> <u>also</u> <u>Viera</u>, 642 F.3d at 417 ("'Benefits under this plan will be paid only if the plan administrator decides in [its] discretion that the applicant is entitled to them.'" (quoting <u>Herzberger</u> v. <u>Standard Ins. Co.</u>, 205 F.3d 327, 331 (7th Cir. 2000)); <u>Feibusch</u>, 463 F.3d at 883 ("The plan administrator has discretionary authority to grant or deny benefits under this plan." (internal quotation marks omitted)); <u>Diaz</u>, 424 F.3d at 637 (stating that "the surest way" for a plan to insulate its benefits denial from de novo review is to "includ[e] language that either mimics or is functionally equivalent" to the <u>Herzberger</u> language).

**C. Our Conclusion**

Our acknowledgment in <u>Brigham</u> of "an increasing recognition of the need for the clearest signals of administrative discretion" foreshadowed the insistence on "greater precision" that has surfaced in the later cases. 317 F.3d at 82. Although we refrained there from entering the discussion in light of the appellant's procedural default, we did "wholly endorse" the <u>Herzberger</u> model language that the Third and Seventh Circuits have since expressly recommended. <u>Id.</u> at 81. Having now fully considered the issue, we agree with those courts holding that the "satisfactory to us" wording, without more, will ordinarily fail to meet the "requisite if minimum clarity" necessary to shift from de novo to deferential review. <u>Herzberger</u>, 205 F.3d at 331. We are

-30-

persuaded primarily by the ambiguity of the phrase, which reasonably may be understood to state Sun Life's right to insist on certain forms of proof rather than conferring discretionary authority over benefits claims. Indeed, in the present context, the language more naturally supports the former reading, as the phrase appears following a listing of the required information and appropriate types of evidence to prove a claim.[17] We reiterate that no precise words are required. Yet, to secure discretionary review, a plan administrator must offer more than subtle inferences drawn from such unrevealing language. To conclude otherwise would negate our requirement of a <u>clear</u> grant of discretion. <u>See Brigham</u>, 317 F.3d at 80 ("We have 'steadfastly applied <u>Firestone</u> to mandate de novo review of benefits determinations unless "a benefits plan . . . clearly grant[s] discretionary authority to the administrator."'" (alterations in original) (quoting <u>Terry</u> v. <u>Bayer Corp.</u>, 145 F.3d 28, 37 (1st Cir. 1998)); <u>Feibusch</u>, 463 F.3d at 883 ("'Neither the parties nor the courts should have to divine whether discretion is conferred. It either is, in so many words, or it isn't." (quoting <u>Sandy</u> v. <u>Reliance Standard Life Ins. Co.</u>, 222 F.3d 1202, 1207 (9th Cir. 2000)).

---

[17] Although the language as used here is unquestionably ambiguous, we do not foreclose the possibility that the same phrase may be clear if used in a context where the only plausible meaning would link it to the administrator's discretion to make eligibility determinations.

Two additional factors contribute to our decision. First, it is not difficult to craft clear language. The model text offered by other courts -- including the wording endorsed in Brigham -- demonstrates that "clear language can be readily drafted and included in policies." Kinstler, 181 F.3d at 252; see also Feibusch, 463 F.3d at 883-84 ("[I]t is easy enough to confer discretion unambiguously if plan sponsors, administrators, or fiduciaries want benefits decisions to be reviewed for abuse of discretion." (internal quotation marks omitted) (alteration in original)). Second, the drafters of ERISA plans have had ample time to take heed of the developing precedent rejecting the adequacy of the "satisfactory to us" language.

Indeed, Sun Life had every opportunity to avoid an adverse ruling on this issue. Our decision in Brigham, which indicated discomfort with the clarity of the "satisfactory to us" wording, made reliance on that language a risky strategy for securing discretionary review of benefits decisions. Sun Life's relationship with the Trust began in 2006 -- three years after Brigham and a year after Diaz. Sun Life was also the insurer in Brigham. We see no reason why it could not have inserted more explicit language in either its policy or the summary policy booklet that it provided to Gross and the other employees covered by the Trust's group policies.

In sum, the "satisfactory to us" language as used in the Sun Life policy insuring Gross does not state with sufficient clarity "that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary." Herzberger, 205 F.3d at 332. Hence, Sun Life's rejection of Gross's claim for benefits is subject to de novo review.

**IV.**

**A. Standards of Review**

As with any summary judgment appeal, we review a district court's decision on the merits of an ERISA benefits case de novo. See Kansky v. Coca-Cola Bottling Co. of New Eng., 492 F.3d 54, 57 (1st Cir. 2007). Given that we play the same role as the district court in evaluating Sun Life's denial of benefits, we have chosen not to remand to that court for application of the correct, de novo, standard for reviewing Sun Life's decision.

Both in the district court and on appeal, however, the summary judgment analysis in ERISA benefits cases differs from the ordinary summary judgment inquiry "in one important aspect." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005). In these cases, "where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue." Id. The non-moving party in an ERISA benefits case is thus not entitled

to the usual inferences in its favor.  Id.; see also Cusson, 592 F.3d at 223-24.

Where, as here, a challenged denial of benefits is subject to de novo review under ERISA because there has been no grant of discretionary authority, "our task on appeal 'is to independently weigh the facts and opinions in the administrative record to determine whether the claimant has met [her] burden of showing that [she] is disabled within the meaning of the policy.'" Scibelli v. Prudential Ins. Co. of Am., 666 F.3d 32, 40 (1st Cir. 2012) (quoting Richards v. Hewlett-Packard Corp., 592 F.3d 232, 239 (1st Cir. 2010)).  In so doing, we give no deference to the administrator's opinions or conclusions.  Id.

We begin by summarizing both the evidence in the administrative record and Sun Life's decisions rejecting Gross's claim for benefits.

## B. Gross's Medical Evidence

### 1.  Dr. Rita Egan

The physician who recommended that Gross stop working, Dr. Rita Egan, a rheumatologist, began treating Gross in February 2006.  The doctor ordered a triple-phase bone scan to look for evidence of RSD, but the results were negative.  Dr. Egan nonetheless concluded that Gross probably had the disease in her right arm, as well as other conditions that were contributing to her difficulties.  For the first of three insurance-related

assessments that Dr. Egan subsequently completed, the doctor prepared an Attending Physician's Statement dated September 23, 2006, classifying Gross's impairment level from her combination of medical problems as a "[s]evere limitation of functional capacity; incapable of minimum (sedentary[]) activity." On the line asking for "objective findings," Dr. Egan wrote that Gross experienced "[p]ain to touch all over but [right] arm is untouchable." The doctor did not note any mental impairment, although she had prescribed an anti-depressant to Gross in April 2006 and stated at that time that, if the drug did not work, Gross would "need[] to see a psychiatrist to help us with her medication."[18]

In the second such statement, completed in October 2006, Dr. Egan stated that Gross's pain had worsened over time, despite treatment, and that Gross could not sit in one place or drive for more than ninety minutes, use her right hand, or firmly grasp with

_____

[18] In notes dated September 20, 2006, Dr. Egan reported:

1. Chronic migraines -- a little improved with present regimen of medications.
2. Widespread pain and right arm reflex sympathetic dystrophy -- she is doing a little better with the medications we have her on, but I think a lot of the problem is depression. It certainly is contributing to her pain. She also is not sleeping well. At this point, I am going to look into another neurosurgeon or anesthesiologist who may be able to put an implantable stimulator or consider cranial stimulation therapy, which I have been reading about with fibromyalgia, and also the patient needs to see a psychiatrist to help with a lot of issues.

-35-

her left hand.  She reiterated her findings that Gross suffered from RSD, fibromyalgia, widespread pain, and fatigue.  Two months later, in the third report ("Attending Physician's Supplemental Statement"), Dr. Egan confirmed Gross's limitations,[19] adding that she could not lift more than ten pounds.  The doctor described Gross's diseases as "chronic" and stated that her condition was expected to last for her lifetime.

### 2. Other Medical Evaluations

In addition to her ongoing treatment with Dr. Egan, Gross consulted with several other medical practitioners.  In October 2005, before she began seeing Dr. Egan, Gross was evaluated by Dr. Tarvez Tucker for complaints of headaches, neck pain, and scoliosis.  Diagnostic tests showed no abnormalities, but Dr. Tucker noted her pain and weakness symptoms:

> [Gross] has intractable transformed migraine, chronic daily headache, which has not been responsive to a variety of preventatives. . . . She also has . . . a lot of radicular upper extremity and cervical pain associated with tingling and numbness of the right arm and hand, which is worse at the end of the day.  She has on examination a drift of the outstretched right upper extremity without pronation, weakness of the intrinsic hand muscles, and diminished perception of primary sensory modalities in the right arm and face.

---

[19] This report varied slightly from the previous one, stating that Gross could not stand or walk for more than an hour, drive for more than ninety minutes, or sit in one place for more than two hours.

In December, Dr. Tucker noted that her headaches had improved, but Gross reported worsening joint and muscle pain.

Dr. Egan twice referred Gross to pain management specialists. In April and May 2006, she saw Dr. William Witt, who diagnosed her with fibromyaligia, CRPS, and "probable post traumatic stress disorder" related to a history of sexual abuse.[20] In May, Dr. Witt observed that "[h]er right hand continues to be reddened, somewhat swollen, and she is holding in a claw position." He deferred medical intervention until after a scheduled evaluation and treatment by a psychologist,[21] but there is no indication in the record that such an evaluation took place.[22] The following year,

---

[20] Among his written findings were the following:

She has multiple health-related problems, various aches and pains throughout her body. . . .

. . . She has definite swelling of the right hand as compared with the left. There is obviously differential sweating as well. . . . [Her gait] is slow and purposeful . . . . She has multiple tender points in all of the classic sites for fibromyalgia.

[21] Dr. Witt noted that he was "very hesitant to engage in any interventional treatment or any further medical treatment . . . until we have had a chance to work with her from a behavioral standpoint which may serve several purposes . . . as this is clearly a sympathetically maintained pain."

[22] As reported in another doctor's notes, Gross apparently explained to Dr. Egan that she could not afford to see the psychiatrist to whom she originally was referred and was to investigate other options. Dr. Egan stated in August 2006 that her scheduled appointments with a psychologist "did not work out . . . because they cancelled." Gross was, however, treated with anti-depressants.

in March 2007, Gross saw Dr. Fred Coates, who joined the chorus of doctors who diagnosed her with fibromyalgia and either RSD or CRPS. Dr. Coates observed that she was "showing signs of severe pain while seated," and further noted that her right arm hung "limply at her side." He described her right hand as "red, slightly swollen, cool to the touch and sweating." He also recommended psychiatric or psychological counseling and treatment.

Meanwhile, in January 2007, Gross underwent a functional capacity evaluation ("FCE") to determine her physical capabilities. The physical therapist who performed the evaluation offered a "[p]rimary" diagnosis of CRPS or RSD, and a "[s]econdary" diagnosis of fibromyalgia. He reported swelling of her right hand, as well as a "shiny" appearance, perspiration, and "increased temperature to touch vs. the left." The report identifies a number of "key limitations" in Gross's physical abilities, including lack of functional use of her right arm, poor standing balance, inability to perform sustained overhead activity, need for assistance or a handrail to negotiate stairs, and inability to crouch, kneel, squat or crawl. The document also lists numerous medications that Gross reported using on a daily basis: Wellbutrin, Duragesic patches, Klonipin, Tizanadine, Lortab, Ambien CR, Valtrex, Estrostep FE, Senokot, Tylenol Rapid Release, Excedrin Tension Headache, and Phaxyme. The FCE concludes that Gross

> does not present at a functional level that
> could maintain sustained work activity. Her

> overall level of physical activity is well below the sedentary level category based upon the frequent position change requirement, lack of bilateral activity ability, and short length of time able to perform activity. Unless there is a significant change in her current level of activity, it is not known what form of employment this client would be able to obtain.

## C.  Surveillance Evidence

Sun Life supplemented the medical evidence by arranging for nine days of video surveillance of Gross during November 2006 and in January and February 2007.  The investigator's written reports reveal little activity by Gross during most of the surveillance days, with three exceptions.  First, on November 9, 2006, shortly after dropping off a teenager believed to be her stepdaughter at school, Gross was observed driving for about an hour and a half to her mother's home, with a brief stop at a rest area along the way.  Second, during the evening of January 11, 2007, Gross drove a short distance with her stepdaughter to a Kmart, where she was observed bending down toward lower-level shelves, extending her arms above her head to retrieve items, and kneeling to examine other items.  Third, on February 21, after receiving a phone call that her mother had been admitted to the hospital with chest pain, Gross drove to a gas station, pumped gas using her right hand, and then drove for two hours to the hospital,

with a brief stop halfway through the trip.  About two hours later, she left the hospital and drove home.[23]

The surveillance reports showed inconsistencies in Gross's stamina and physical abilities.  On multiple occasions, she was seen limping, but also was twice described as "jogging" a few steps.  On November 7, for example, Gross left home with her husband at 7:17 AM to vote at a local elementary school, returned home at 7:34 AM, and then departed again with her stepdaughter at 8:21 AM for an apparent appointment at a nearby office building.  When they returned home at 9:27 AM, Gross appeared to be limping.  The investigator remained on the scene, but observed no further activity before his departure at about 4 PM.  Two days later, the investigator reported that Gross "jogged down the sidewalk" to her car before driving her stepdaughter to school.

## D.  The Independent Medical Examination ("IME")

On February 22, 2007, the last day of video surveillance and the day after Gross had driven to the hospital to see her mother, an IME was conducted at Sun Life's request by a

---

[23] Sun Life states in its brief that Gross made the return trip without stopping.  Although that may be a fair inference from the record, Gross correctly notes that the investigator did not explicitly say that she did not stop.  Despite stating that he "followed [Gross] approximately the same distance back towards her residence," he evidently lost sight of her at some point because, when he arrived at her residence, her car was already parked and she had entered her home.

neurologist, Dr. Rukmaiah Bhupalam.[24]  The investigator observed Gross walk with a limp as she left home that morning for the appointment and, when she emerged from the doctor's office more than four hours later, she was seated in a wheelchair pushed by her husband.  Once they reached home, Gross's husband opened the car door for her, though she stood up without assistance.  The couple embraced before walking arm-in-arm up the driveway toward the house.  About halfway to the front door, Gross's husband held on to her right arm as she walked, with a slight limp, the remaining distance.

In his initial report of the IME, dated March 19, Dr. Bhupalam stated that Gross's husband had "to assist her to move from [a] chair to the bed as she appeared to be in significant pain and she could not use her right hand."  Gross told Dr. Bhupalam that "she is usually able to walk 6 hours after she changes her Duragesic patch [pain medication delivered through the skin], and

_____

[24] This independent evaluation was recommended by Dr. James Sarni, a Sun Life medical consultant who had reviewed the information in Gross's chart.  Dr. Sarni noted that

> the documentation does not strongly support a diagnosis of reflex sympathetic dystrophy or complex regional pain syndrome. . . .

> Therefore, it would be helpful if this patient were to be evaluated by a neurologist who would have experience in treating migraine headaches.  Any neurologist should be able to comment intelligently upon the right upper extremity and whether or not they believe it is consistent with complex regional pain syndrome or RSD and what steps could be taken to both diagnose and treat it.

-41-

she can function better for approximately 10 to 12 hours after that and again she goes downhill." The doctor stated that Gross's "main difficulty is ambulating because of pain and also use of her right hand." He diagnosed Gross with, inter alia, chronic fibromyalgia and "probably complex regional pain syndrome," but speculated that "emotional factors . . . could be contributing to her pain symptomatology," and recommended that she be seen by a behavioral specialist or mental health professional. In conclusion, Dr. Bhupalam stated that Gross is "unable to return to [her] prior occupation and is totally disabled even for sedentary work even on a part time basis."

Immediately after receiving Dr. Bhupalam's report, Sun Life sent him copies of the video surveillance. After viewing the recordings, the physician changed his assessment:

> [I]t does appear that she can function very well without any difficulty and appears neurologically normal even the day before my examination. On the day of examination she was limping even in the videotape however, this appears to be a functional component. Based on the observation in the video tape, especially on the day before, and also to previous videotapes in January and November, I do feel that she can function quite well and probably will be able to return to her previous occupation as a manager in a multi physician opthalmology and optometric office. However, a re-evaluation might be beneficial. It does appear that she can use both upper and lower extremities quite well and her gait also appears to be normal, and she does not appear to be in any pain or discomfort in the video recorded on February 21, 2007 just a day before my evaluation in the office. Even on

the videos that were done in November and
January, it appears that she can function
quite well, based on my review of the video.

Following Dr. Bhupalam's examination, Sun Life obtained a paper
review of Gross's medical records from another medical consultant,
Dr. William Hall, who likewise noted that the surveillance videos
undermined Gross's subjective reports of pain and functional
limitations.

## E.  Sun Life's Benefits Decisions

In a seven-page letter dated April 23, 2007, Sun Life
notified Gross that it had denied her benefits claim because of
"insufficient objective evidence to substantiate" a disability that
precluded her from performing her duties at Pinnacle.  The letter
cited to the surveillance evidence, which in Sun Life's view
demonstrated "a capacity for activity that far exceeds" the limits
described in Gross's claim forms.  The insurer specifically
referred to Dr. Bhupalam's reports, and it quoted from Dr. Hall's
file review.  Dr. Hall's evaluation highlighted the absence of
"[c]onsistent and abnormal objective physical and neurological
findings," other than the doctors' reports of swelling, temperature
variation, perspiration, and discoloration of her right arm.  He
further noted that, while Gross's medical records "provisionally
support diagnosis of RSD right arm and hand," the surveillance
video "compellingly weighs against" that diagnosis and
corresponding activity restrictions.

-43-

Gross filed an appeal of Sun Life's decision, which she supported with results of a fourth functional capacity evaluation by Dr. Egan.[25] In that November 2007 report, the doctor again diagnosed CRPS in the right arm, fibromyalgia, severe migraines, and chronic fatigue, as well as depression. She observed that Gross's right arm was colder and discolored, "as is seen in complex regional pain syndrome," and that Gross "can hardly raise her arm." She further reported that Gross spends most of her day in bed or on a recliner and that "[a]ctivity leads to worsening pain." Predicting that Gross was "unlikely to improve," the doctor summarized her conclusions as follows:

> She has had symptoms for many years. No medication or other modality has made her able to function well enough to have a life at home much less at work. With these diagnoses, she is unlikely to get to the point she will be able to work.

Dr. Egan stated that Gross was limited to sitting and standing for no more than one hour per day, and that she could neither push nor lift any weight. The physician also noted that Gross's work capacity was further limited by the effects of four prescription medications, which left her tired or with trouble thinking, or both.

---

[25] Gross submitted a forty-seven page letter to Sun Life in December 2007, which, inter alia, reviewed evidence that she previously had submitted and described the results of Dr. Egan's most recent assessment.

Sun Life rejected the appeal on January 23, 2008. Its letter of explanation relied heavily on a report from a third-party medical consultant, who had performed a paper review of Gross's medical file earlier that month. The physician, Dr. Alan Neuren, noted "the marked dichotomy between [Gross's] reported appearance, behavior, and findings when seen by healthcare providers . . . compared with her appearance under surveillance," and asserted that "[t]he only reasonable conclusion" to be drawn "is that she has deliberately embellished her symptoms to her providers for secondary gain." Invoking the multiple medical reports that had questioned the medical support for, and thus the veracity of, Gross's complaints, Sun Life stated that "[t]he severe restrictions and limitations, as noted by Dr. Egan on . . . September 23, 2006, are clearly not credible when viewed in light of Ms. Gross' demonstrated functional capacity on the surveillance video." The insurer thus found "no basis on which to conclude that Ms. Gross would be unable to perform the Material and Substantial Duties of her Own Occupation."

**F. Discussion**

Gross argues primarily that Sun Life gave unjustified weight to the surveillance videotapes. She asserts that the insurer wrongly depicted the activity seen during the surveillance as inconsistent with the physical limitations determined by the physicians and physical therapist who examined her, and she

emphasizes that the episodes highlighted by Sun Life constituted a small percentage of the time she was observed. With respect to the long-distance driving in particular, she objects to Sun Life's failure to take into account -- and inform its medical consultants about -- her mother's poor health and medical emergency. Sun Life, meanwhile, insists that the surveillance videotapes provide substantial evidence in support of its denial of Gross's claim, and it highlights the absence of objective evidence in support of her proffered diagnoses and limitations.

In considering these arguments, we initially put to one side the video surveillance, considering its impact only after examining the medical evidence.

**1. Medical Analysis**

We have no difficulty concluding that the medical evidence in the record, if credited, is adequate to prove Gross's entitlement to disability benefits. Her long history of migraines, extreme fatigue, and widespread muscular pain is well documented, and the progressive weakness and numbness affecting her right arm and hand are also supported by numerous medical reports. Without exception, the doctors who examined her viewed her symptoms to be consistent with RSD, CRPS, fibromyalgia, or more than one of those illnesses. Although many of Gross's physical complaints may not be readily susceptible to objective confirmation, findings of chronic pain may not automatically be dismissed by a benefits administrator

for lack of confirmable symptoms.  See, e.g., Maher, 665 F.3d at 304 (Lipez, J., dissenting) ("Our court has emphasized before that in dealing with hard-to-diagnose, pain-related conditions, it is not reasonable to expect or require objective evidence supporting the beneficiary's claimed diagnosis."); Cusson, 592 F.3d at 227 (recognizing that "fibromyalgia is a disease that is diagnosed primarily based on a patient's self-reported pain symptoms"); Denmark v. Liberty Life Assurance Co. of Bos., 481 F.3d 16, 37 (1st Cir. 2007), vacated on other grounds, 566 F.3d 1 (1st Cir. 2009) ("We have previously found it unreasonable for an insurer to require objective evidence to support a diagnosis of a condition that is not subject to verification through laboratory testing.").

Importantly, however, the record here includes objective evidence, as well as the recognition by Sun Life's own medical consultant, Dr. Hall, that Gross's "musculoskeletal symptoms, as presented by her, are credible to treating and consulting physicians."  Indeed, Dr. Hall wrote that the medical records he had reviewed "support her reported subjective symptoms, and provisionally support diagnosis of RSD right arm and hand."  For example, each of the medical professionals who examined Gross found her right arm to be visibly abnormal in one or more ways, including: reddened, blue or purplish, swollen, "profuse sweating," shiny, cool to the touch, or with "increased temperature to touch vs. the left."  Multiple doctors viewed these distortions as

-47-

symptomatic of RSD or CRPS.[26]  In addition, the physical therapist who performed her FCE, Chris Kaczmarek, noted that the "[g]eneral muscle tone of the right upper extremity and bilateral lower extremities was . . . hypotonic."[27]

Moreover, not only did the examining doctors uniformly perceive her complaints of pain and limited capacity to be credible, but Kaczmarek also reported that, when undertaking tasks for the FCE, Gross was cooperative and "willing to work to maximum abilities in all test items."  He further observed that Gross's "perceived abilities . . . are consistent with client's functional abilities objectively identified during the FCE."  His assessment that she "gave maximal effort on all test items" was based on his observations of "predictable patterns of movement including increased accessory muscle recruitment, counterbalancing and use of momentum, and physiological responses such as increased heart rate."  These objective indicators of effort diminish the possibility that Gross was deliberately "failing" the capacity test and lend weight to Kaczmarek's report that Gross was "physically

_____

[26] The Mayo Clinic's list of indicators of CRPS, which is defined as "an uncommon form of chronic pain that usually affects an arm or leg," includes many of these qualities, including swelling of the affected area, changes in skin temperature, discoloration, and a shiny skin appearance.  See Complex Regional Pain Syndrome, MayoClinic.com, www.mayoclinic.com/health/complex-regional-pain-syndrome/DS00265 (last visited Aug. 7, 2013).

[27] "Hypotonic," in the physiological sense, is defined as "[h]aving less than the normal tone."  Random House Dictionary of the English Language (2d ed. 1987) 945.

-48-

unable to perform" a range of tasks. Medical notes from various doctors show that her weight dropped by about thirty pounds between October 2005 and March 2007.

Gross's good faith in describing her limitations is also reinforced by letters from her co-workers and employers -- not mentioned in either of Sun Life's denial letters -- describing her persistence in continuing to work despite obvious pain and compromised physical capacity. Indeed, contrary to Sun Life's assertion in its initial denial letter that Gross chose to stop working,[28] Pinnacle's Paul Wedge told the insurer that "[w]e stopped her from working when we received her doctor orders that she was not fit to work." In a "To Whom It May Concern Letter" written in February 2007, the general manager of the optometry practice where Gross worked described the "steady decline in the use of her arms and legs for nearly nine months."[29] Simply put, this does not seem

---

[28] The pertinent paragraph in the denial letter was as follows:

Therefore, it does not appear that you would be eligible for Total Disability benefits, Partial Disability benefits or benefits under the rider attached to your policy based on our thorough review of all of the medical, occupational and other information in the claim file. Rather, any loss of income appears to be as a result of a choice to stop working for your Employer and not as a result of any change in restrictions and limitations that would prevent you from performing a light occupation.

[29] Gross's boss, Mike Feeney, elaborated in his letter as follows:

Countless times I spoke with Diahann about the need to

to be the history of a person seeking to exaggerate her illnesses to avoid working and obtain disability pay.  Cf. Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004) (observing that claimant's performance during FCE was inconsistent and she "did not put forth her maximum effort during the tests").

Of course, the medical evidence is not entirely favorable to Gross.  All of her diagnostic tests, including a bone scan that is sometimes used to diagnose RSD, were negative, and Dr. Bhupalam noted that "there is no definitive evidence" for that syndrome. Dr. Hall noted that neither Gross's "symptoms nor varying right arm or hand findings explained by appropriate MRI, CT, radioisotope or electrophysiologic findings or by hematologic, metabolic, endocrinologic or renal testing."  Dr. Coates pointed, inter alia, to Gross's report that her Fentanyl pain-relief patch inexplicably

---

take time off, to take care of herself before the job responsibilities.  Stubborn is not a strong enough term each time she told me to mind my own business.  She wasn't going to give in until she absolutely had to.  She never lacked in doing a great job in the office.  It wasn't until early May of 2006 when I witnessed her fall in the office, that I felt I could do something to try and help.  That day after falling, she couldn't use her legs and get up.  Dr. Baier (staff Optometrist) and myself assisted her up into a chair, and I refused to take no for an answer.  The two of us drove her home, helping her into her home.  I did not allow her back into the office until she obtained a doctor's note releasing her for work.  She gave me that on May 10, 2006 and returned.

Another letter, from Dr. Baier, noted that, in August 2006, "Ms. Gross finally succumbed to the advice of her physicians, family, friends and co-workers and terminated her employment."

wore off "in what would normally be the middle of the dosing."  The doctors who performed physical examinations speculated that the severity of her symptoms might be attributable in part to psychological factors and recommended that she obtain counseling or behavioral treatment.  <u>See</u>, <u>e.g.</u>, App. at 416 (Dr. Egan, in September 2006, stating that she believes "a lot of the problem is depression" and that Gross "needs to see a psychiatrist"); <u>id.</u> at 394 (Dr. Coates in March 2007); <u>id.</u> at 448 (Dr. Witt); <u>id.</u> at 459 (Dr. Bhupalam).  She did not do so.

Nonetheless, even with negative tests and some puzzlement over the extent of her reported pain, doctors continued to diagnose her with RSD and fibromyalgia.  The negative bone scan -- emphasized by Sun Life -- is not decisive.  A CRPS fact sheet prepared by the National Institute of Neurological Disorders and Stroke ("NINDS"), a 2007 version of which is contained in the record, reported that "CRPS is diagnosed primarily through observation of the signs and symptoms" and stated that "there is no specific diagnostic test for CRPS."  R. 03359.  The NINDS fact sheet further explained:

> [T]he most important role for testing is to help rule out other conditions.  Some clinicians apply a stimulus (such as touch, pinprick, heat, or cold) to the area to see if it causes pain.  Doctors may also use triple-phase bone scans to identify changes in the bone and in blood circulation.

<u>Id.</u>[30]  The repeated referrals to counseling also reflect common practice in treating CRPS.[31]

In sum, the sustained and progressive nature of Gross's complaints, their facial credibility to the medical practitioners who personally examined her, and the objective symptoms consistent with RSD -- given the absence of any method for reaching a conclusive diagnosis -- support a finding of total disability. <u>Cf.</u> <u>Maher</u>, 665 F.3d at 293 n.4 (observing that the claimant arguably would be unable "to fool so many doctors over so many years if there were little or no serious pain").  The narrative changes, however, with the addition of the surveillance evidence.

### 2. Surveillance Videotapes

The immediate about-face of Dr. Bhupalam, an independent medical consultant whose April 2007 report was the final medical

---

[30]  The current version of the fact sheet appears at http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/detail_reflex_sympathetic_dystrophy.htm#241003282  ("NINDS Fact Sheet") (last visited Aug. 7, 2013).

[31] The current NINDS fact sheet lists psychotherapy as one form of treatment for relieving the symptoms of CRPS.  It states:

> CRPS and other painful and disabling conditions often are associated with profound psychological symptoms for affected individuals and their families.  People with CRPS may develop depression, anxiety, or post-traumatic stress disorder, all of which heighten the perception of pain and make rehabilitation efforts more difficult.  Treating these secondary conditions is important for helping people cope and recover from CRPS.

NINDS Fact Sheet, <u>supra</u>.

evaluation before the initial rejection of Gross's claim, reveals the impact of the surveillance evidence on Sun Life's decision to deny benefits. Although Dr. Bhupalam's examination of Gross and her medical history had led him to conclude that Gross "is totally disabled even for sedentary work even on a part time basis," the videotapes led him to the opposite conclusion: "I do feel that she can function quite well and probably will be able to return to her previous occupation as a manager in a multi physician ophthalmology and optometric office."

Dr. Neuren, whose paper review of Gross's file was the final medical assessment before Sun Life's second rejection of her claim, similarly placed substantial weight on the videotapes. He noted "the marked dichotomy between her reported appearance, behavior, and findings when seen by healthcare providers (her own treating physicians, along with Dr. Bhupalam and therapist Kaczmarek) compared with her appearance under surveillance." Addressing the one objectively manifested symptom noted by all examiners, Dr. Neuren stated that "[t]he reported sweating, redness, etc. can be self induced and may have been in this instance." Dr. Neuren opined that the inconsistencies between Gross's "observed activities while under surveillance and her appearance in the physicians' offices are . . . indicative of symptom embellishment," and he concluded that "[i]t is obvious that there has been no loss of function."

We have long recognized that even limited surveillance is a useful way to check the credibility of individuals who claim disability based on symptoms that are difficult to evaluate through objective tests. See, e.g., Cusson, 592 F.3d at 229 ("We have permitted ERISA plan administrators to use this type of sporadic evidence in the past."); Denmark, 481 F.3d at 38 (recognizing that insurer could properly use an investigator's report and photographs in making the benefits determination); Tsoulas v. Liberty Life Assurance Co., 454 F.3d 69, 80 (1st Cir. 2006) (approving insurer's reliance on both surveillance evidence and medical advice). Where the activities captured on video directly contradict a claimant's asserted limitations, and there is no definitive evidence of a disabling condition, the surveillance alone could provide adequate support for a denial of benefits. See, e.g., Cusson, 592 F.3d at 229-30 (noting that the insurer "reached its decision not because it failed to consider the evidence in [claimant's] favor, but because it determined that the surveillance results undermined the credibility of important portions of that evidence"); Tsoulas, 454 F.3d at 74-75 (affirming denial of benefits where claimant stated, inter alia, that she could not walk or stand without assistance and spent fourteen to eighteen hours in bed each day and surveillance showed her walking without assistance and "traveling to a hotel, a parking garage, a restaurant, a comedy club, a night club, and back to the hotel on a single day").

Sun Life maintains that this is such a case. On this record, under a de novo standard of review, we cannot agree. In our view, the most significant incompatibilities between Gross's reports and her observed functional capacity arise in three episodes recorded by the investigator: the two lengthy drives to see her mother, and the evening shopping excursion to Kmart in which Gross was seen in a short span of time reaching over her head, bending, and kneeling, with "no signs of guarded motion." Without these more ambitious activities, the remainder of the observations cited by Sun Life -- Gross's jogging a few steps on two occasions, driving short distances for errands or appointments, and walking without limping or other signs of pain -- could be dismissed as day-to-day variations in physical ability related, inter alia, to fluctuations in her level of fatigue and the timing of pain medications. Indeed, even the ninety-minute drive to her mother's home on the morning of November 9, 2006 was within the limitations specified by Dr. Egan, who reported that Gross could not sit or drive for more than that amount of time. Notably, Gross stopped at a rest area one hour into the trip, and it is not known when she drove home. The investigator left while Gross was still at her mother's home, and no surveillance took place the next day.

The trip to Kmart on January 11, which spanned an hour door-to-door in the early evening, is more at odds with Gross's reported limitations. Though accompanied by her stepdaughter,

Gross was seen reaching for an item above her head, bending down to the lower level of the shelves, and kneeling to examine other items.  Once at home, Gross carried two plastic bags as well as her purse from the car to the house.  All of these movements occurred with no reported hesitancy or instability.  According to physical therapist Kaczmarek, however, Gross reported a week later that "she tolerates short bouts of activity for less than a few minutes," and that she has "difficulty walking with frequent falls."  Based on his testing, Kaczmarek concluded that Gross had "[p]oor standing balance," "[u]nstable gait pattern requiring assistance of device or hand held assistance," and "[i]nability to get into and out of positions such as crouching, kneeling, squatting, crawling."

The 120-mile round-trip drive on February 21 from her home to the medical center in Ashland, Kentucky, is particularly troubling.  Before setting off on the trip, Gross pumped gas, "us[ing] her right hand to hold the gas nozzle in her gas tank." She then drove for an hour before stopping at a rest area, where she was observed "walk[ing] quickly and show[ing] no signs of guarded motion."  When she exited the restroom, she was seen walking quickly to her vehicle and taking two jogging steps before entering the car.  She drove for another hour to the medical center, arriving at about 1:30 PM, and two hours later made the return trip home -- possibly without a rest stop along the way. Gross's activity on this day was singled out by Dr. Bhupalam in his

revised assessment of her ability to work. Her manipulation of the gas pump is especially noteworthy given her reports of pain and numbness and "little functional usage" of her right hand.

Dr. Bhupalam also noted, however, that "a re-evaluation might be beneficial" -- an observation we understand to suggest that the video surveillance, while damaging to Gross, did not necessarily undermine her claim. Indeed, the record does not show that either Dr. Bhupalam or Dr. Neuren knew that Gross's travel to the medical center in Ashland was in response to a phone call reporting that her mother had experienced a medical emergency, possibly a heart attack. Dr. Neuren, in fact, commented in his report that "[i]t is unclear who the claimant was seeing [at the medical building in Ashland] or why she would need to travel so far to be seen." We consider knowledge of the reason for Gross's unusual travel that day essential for any reliable appraisal of her medical condition. Individuals often rise to the occasion in the event of an emergency. Hence, on the current record, we are unable to judge whether Gross's condition and physical limitations, as she reports them, are necessarily inconsistent with her activities that day. In context, the extra driving, the hurried movements, the pumping of gas may have been at the far edge of what she could manage with the aid of medication in the face of a family crisis.[32]

---

[32] Gross reported to two different doctors in March 2007 that she retained at least some use of her right arm. She told Dr. Coates that she could lift her arm slightly after changing her pain

In addition, the pain and functional limitations observed by Dr. Bhupalam during his examination of Gross the next day might possibly have been the price she paid for those actions, supporting her claim that she could not handle such activities on a daily basis. It is also noteworthy that on February 23, two days after the trip and the day after the doctor's visit, the investigator observed no activity by Gross.

Sun Life's handling of the inconsistencies between the medical reports and the video surveillance -- specifically its apparent failure to provide important context to Dr. Bhupalam and its internal reviewers -- raises a legitimate question about whether Sun Life has made a bona fide effort to determine Gross's capabilities. On de novo review, we have no choice but to remand. As the record now stands, we are unable to resolve the debate between the parties on the significance of the surveillance evidence. Although the medical evidence in Gross's favor is impressive, it is not monolithic and the surveillance results diminish its force. The capabilities documented on video, particularly on January 11 and February 21, require us to look more skeptically at Gross's self-reported complaints of constant pain, fatigue, and limited function. Yet, we are unwilling to disregard the evidence in her favor without any contextualized assessment of

---

medication patch, and she told Dr. Bhupalam that she felt the "right upper extremity" is "almost useless almost 95% of the time."

the most significant departures from her professed limitations. See <u>Marantz</u> v. <u>Permanente Med. Grp, Inc. Long Term Disability Plan</u>, 687 F.3d 320, 329 (7th Cir. 2012) ("[T]he weight given to surveillance evidence of this type depends both on the amount and nature of the activity observed."); <u>Maher</u>, 665 F.3d at 295 (same).

We recognize that Gross bears the burden to prove disability. Moreover, as Sun Life pointed out in rejecting her appeal, she did not submit a statement from her own doctor refuting Sun Life's assertion in its original denial letter that the surveillance "show[ed] a capacity for activity that far exceeds" the limitations she claims. This omission highlights what we regard as the open question: the effect that the surveillance evidence, when viewed in context, may have on other evidence indicating disability.[33]

Hence, as in <u>Maher</u>, we cannot "say with assurance that [Sun Life] denied [Gross] benefits to which she was entitled," but we also have doubts about Sun Life's justification for its decision. 665 F.3d at 295. We will remand this case so that the parties can further address both the significance of the video evidence in assessing Gross's limitations and the veracity of her self-reported and observed symptoms, particularly concerning the

---

[33] Relatedly, we note that Dr. Neuren's assertion that the physical abnormalities affecting Gross's right arm could have been self-induced is unexplained and thus provides dubious support for his conclusion that Gross likely exaggerated her symptoms. This gap, too, can be explored in future proceedings.

condition of her right arm.  Cf., e.g., Buffonge, 426 F.3d at 22 (ordering remand to the claims administrator for a new review); Quinn v. Blue Cross & Blue Shield Ass'n, 161 F.3d 472, 477 (7th Cir. 1998).

## V.

To recap, we hold that Pinnacle's disability policy was a component of a benefits plan governed by ERISA and that the applicable standard of review for benefits claims under the plan is de novo.  Applying that standard to the evidence currently in the record, we cannot determine whether Sun Life justifiably rejected Gross's disability claim on the basis of the surveillance video and the likelihood of symptom embellishment, particularly relating to her right arm.

We therefore vacate the judgment appealed from and remand the case to the district court, with directions that it remand the matter to Sun Life for proceedings consistent with this opinion. The insurer, as plan administrator, will have the opportunity to address the concerns that we have identified, i.e., the significance of the video evidence in assessing Gross's limitations and the veracity of her self-reported and observed symptoms. Gross, in turn, must be given the opportunity to respond.  Before the district court enters its remand order, it should hear from the parties on whether to allow the record to be supplemented beyond those specific inquiries.  We leave to the district court's

discretion whether to retain jurisdiction while the supplemental administrative process goes forward.  We take no view as to the outcome of the further proceedings to be held on remand.

<u>So ordered.</u> <u>Each party to bear its own costs.</u>